244 So.2d 782

**Don EVANS, Individually and d/b/a Evans Feed Mill, etc.**

**v.**

**Dean TANNER.**

**I Div. 515.**

Supreme Court of Alabama.

Feb. 4, 1971.

Rehearing Denied March 4, 1971.

Cunningham, Bounds & Byrd, Mobile, for appellee.

Johnston, Johnston & Nettles and Robert G. Kendall, Mobile, for appellant.

COLEMAN, Justice.

The defendant appeals from a judgment for plaintiff for $10,000.00 in an action for personal injury allegedly sustained by plaintiff as the proximate consequence of defendant's negligence in the maintenance of a place in defendant's feed mill where plaintiff slipped and fell.

Plaintiff alleges that he entered the office of the mill for the purpose of selling corn to defendant, and that upon leaving the office and while on the premises maintained by defendant for the use of persons selling corn and entering and leaving the mill, plaintiff slipped and fell and suffered the injuries complained of.

The complaint is in three counts. In Count One, plaintiff charges that defendant negligently maintained "said floor at the place where Plaintiff slipped and fell in an unsafe condition for use of customers at said feed mill."

In Count Two, plaintiff charges that while on "the walkway" maintained by defendant for the use of persons selling corn to defendant and entering and leaving the mill, plaintiff slipped and fell. Plaintiff charges that defendant negligently maintained "said walkway adjacent to the place where Plaintiff" slipped and fell.

In Count Three, plaintiff charges that defendant negligently maintained "said walkway" where plaintiff slipped and fell.

The evidence discloses that defendant operates a mill where corn and other grains, hay, and other feedstuff are ground and mixed so as to become feed for livestock. The floor plan of the main building is rectangular in shape and the dimensions appear to be approximately 100 feet by 50 feet. Onto one end of the main building there is a room which will be referred to as the unloading room. It is about 50 feet long by 20 feet wide. The fifty-foot wall at the end of the main building forms one wall of the unloading room. Twenty feet across from and directly opposite this fifty-foot wall is another wall fifty feet long. These are the two walls of the unloading room. The two ends of the unloading room are not enclosed. There is a roof over the unloading room.

Trucks containing corn and other feedstuff are driven into the unloading room and the contents of the trucks are dumped onto the floor at a place referred to as the pit, which is a rectangular opening about 12 feet long by 7 feet wide. Five metal pipes about 12 feet long are laid parallel across the top of the pit and level with the floor. The pipes are referred to as "4 inch pipes" meaning, we take it, four

inches in diameter; but, plaintiff's Exhibit No. 1 appears to show the diameter as three inches. The 12-foot dimension of the pit is parallel with the 20-foot dimension of the unloading room between the two walls, and 8 feet of floor space is left between the two ends of the pit and the two walls. This space between pit and wall is 4 feet plus a few inches at one end of the pit and 3 feet plus a few inches at the other end.

There is space between each of the five pipes which are parallel with each other. The operation seems to be that a loaded truck is driven into the unloading room and the truck is stopped so that the back end of the truck is over the pit. The front end of the truck is then raised by an elevating mechanism so that the contents of the truck slide out the back end and fall onto the pipes and pass through the openings between the pipes down into the pit. There is an auger device at the bottom of the pit which moves the stuff dropped into the pit into the main building where the stuff is ground and mixed.

There is a door in the wall between the main building and the unloading room. It appears from plaintiff's Exhibit 1, the distance between the side of this door and the closest corner of the pit is about five feet.

On the day of injury, prior to going to the mill, plaintiff had telephoned the mill and had been told by defendant's employee, Ward, that defendant would buy a load of plaintiff's corn and for plaintiff "to bring it on in." Plaintiff drove his truck loaded with corn to the mill and parked the truck. One or two other trucks were being unloaded ahead of plaintiff. Plaintiff went into the office in the main building of the mill. Plaintiff did not remember which entrance he used in going into the building.

As we understand it, plaintiff did sell his load of corn to defendant. After he had been in the office for a period of time, the trucks ahead of plaintiff were almost finished and it was plaintiff's turn next. He left the office and started to leave the main building through the door in the wall between the main building and the unloading room.

When plaintiff came through the door, a pickup truck was at the pit ready to be dumped. An employee of defendant was feeding hay into the small pit. The employee was standing in the area between the end of the pit and the wall of the main building. Some hay and some bags were in the area between the pit and the wall of the main building.

Plaintiff does not remember whether he stopped or not when he came through the door. He walked across the pit. When he stepped upon the pit his feet slipped and his head hit the pipes. On cross-examination, he testified that when he came out the door he walked straight across the pipes. He did not ask the employee to get out of his way.

Plaintiff was wearing rubber boots. He had been working around his barn "several hours before" that morning and had walked over a dirt area from his truck into the mill. It was muddy. He does not know whether he got mud on his "shoes." He did not know that "those bars might be slippery."

Plaintiff had been to the mill several times. He has gone out all other doors of the building except a small door at the other end. When he came out of the door, between the main building and unloading room, he could have turned right and gone out that way, but he would have had to climb over "a lot of paraphernalia there—sacks and stuff."

He knew the pit was there. He testified:

"Q You didn't think an iron pipe would be slippery with rubber boots on?

"A I didn't—

"Q You didn't think about it at all, did you; you just came out that door

and walked straight across those pipes without looking to the right or left, didn't you?

"A It's the normal procedure with everybody.

". . . . . . . . . .

"Q You had frequently walked across these pipes?

"A I had walked across them." Defendant's mill foreman testified:

"Q Mr. Ward, you've fallen in the pit yourself, haven't you?

"A No, sir, I don't believe so.

"Q Trying to walk over it?

"A No, sir, I don't remember it.

"Q You haven't done that; have you walked over the pit?

"A Yes, sir, I have.

"Q Why do you walk over it, because it's more convenient?

"A Well, we not necessarily walk over it, we have to step on the pit sometimes unloading the trucks.

"Q Actually, you've walked over the pit, haven't you?

"A Well, we might have.

"Q Weren't you asked this question: 'Have you ever walked over the pit?' And didn't you answer: 'Yes, sir, I have.', when your deposition was taken?

"A Well, that's what I say, we have to—in carrying on our work there, we have to get on the pit at times—

"Q Yes, sir.

"A —to unload the trucks.

"Q Then you have to get on it when the sides are blocked, don't you?

"A No, the times that we would normally get on it is when there is a truck on there being unloaded and we come up from behind there and stand on the pit."

## I—IV.

Defendant contends that the court erred in refusing affirmative charges, with and without hypothesis, requested in writing by defendant separately and severally to the complaint as a whole and to each of the three counts. Defendant also contends that if this court find that defendant was not entitled to any of the requested affirmative charges, the trial court erred, nevertheless, in overruling defendant's motion for new trial because the verdict is not sustained by the great preponderance of the evidence.

Defendant's argument is that the court erred in refusing defendant's requested affirmative charges for two reasons, to wit:

1. ". . . . due to the fact that appellee wholly failed to prove negligence on the part of appellant or"

2. ". . . . due to the further fact that the evidence shows without contradiction that appellee was contributorily negligent."

The evidence as summarized above is, of course, that which is favorable to plaintiff. Aiken v. McMillan, 213 Ala. 494, 106 So. 150, ¶ [32–35]. It does not appear, however, that there is any material contradiction in the evidence. The contradiction appears in the inferences to be drawn from the evidence.[1] Plaintiff contends that the evidence supports an inference that defendant was negligent in maintaining the

---

1. "'. . . When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court.'—Grand Trunk Ry. Co. [of Canada] v. Ives, 144 U.S. 408, 417, 12 S.Ct. 679, 682, 36 L.Ed. 485." Reaves v. Maybank, 193 Ala. 614, 619, 69 So. 137, 138.

area where plaintiff fell, and defendant contends to the contrary.

 The evidence that defendant's employee had told plaintiff to bring the corn to the mill clearly supports a finding that plaintiff had been invited to come to the mill premises for business purposes and was an invitee. We think the evidence supports a finding that plaintiff was in a place included within the scope of the invitation at the time plaintiff fell. Defendant contends that plaintiff was not invited to walk across the pit and was not in an area within the scope of the invitation when plaintiff walked across the pit. We disagree. Plaintiff testified to effect that walking across the pipes was normal procedure, and that he had previously walked across the pipes. The testimony of defendant's foreman supports an inference that it was not unusual for people to walk or stand on the pipes.

"The duty of defendant was to use ordinary or reasonable care to keep its premises in a reasonably safe condition. It was not an insurer of the safety of its guests or invitees. The principle of *res ipsa loquitur* does not apply. F. W. Woolworth Co. v. Ney, 239 Ala. 233, 194 So. 667; Ten Ball Novelty & Mfg. Co. v. Allen, 255 Ala. 418, 51 So.2d 690; Britling Cafeteria Co. v. Naylor, 254 Ala. 84, 47 So.2d 187, and cases cited.

"Defendant is required to exercise reasonable care before its invitee comes to his premises to have the premises reasonably free from danger to the invitee when he arrives and to so keep the premises while the invitee is on the premises where he may be expected or was invited to go. Britling Cafeteria Co. v. Naylor, supra." Kittrell v. Alabama Power Co., 258 Ala. 381, 383, 63 So.2d 363, 364. See also: First National Bank of Mobile v. Ambrose, 270 Ala. 371, 119 So.2d 18.

 We are of opinion that it was for the jury to say whether defendant did maintain the place where plaintiff fell

reasonably free from danger, and that the evidence supports a finding that defendant was negligent in that he did not exercise ordinary or reasonable care to keep the premises in a reasonably safe condition. The cases relied on by defendant, to wit: Hertz v. Advertiser Co., 201 Ala. 416, 78 So. 794; Lamson & Sessions Bolt Co. v. McCarty, 234 Ala. 60, 173 So. 388; Great A & P Tea Co. v. Popkins, 260 Ala. 97, 69 So.2d 274; Claybrooke v. Bently, 260 Ala. 678, 72 So.2d 412; Crawford Johnson & Co. v. Duffner, 279 Ala. 678, 189 So.2d 474; and Green v. Reynolds Metals Co., 328 F.2d 372; do not hold to the contrary as we understand them.

The second point made by defendant is that plaintiff was guilty of contributory negligence in walking across the pipes. There were other exits from the main building, but there is evidence that the other exits also were hazardous or inconvenient because of the height of the exit from the ground or because of the circumstances at the exit or in the area through which plaintiff would have necessarily been required to pass to reach the exit.

In affirming a judgment for plaintiff in an action for injury suffered by plaintiff when he fell at a hole in the sidewalk of which plaintiff had knowledge, this court said:

"The defense interposed was *contributory negligence* on the part of the plaintiff, based upon an alleged want of ordinary care on his part. It would seem a legal truism to say, that it could not be deemed a want of ordinary care for the plaintiff to do what all other persons, similarly circumstanced, were in the constant habit of doing, without accident or injury to themselves, so far as is disclosed by the evidence, which is set out in the bill of exceptions. There was ample room for the plaintiff to have safely passed between the fence and the *wash-out*, and his very familiarity with the existence of the defect may have been

an argument in his own mind inducing him to believe that he could pass it in safety. The possession of a walking-cane, with which he seems to have felt his way along when approaching the defective place, was a circumstance, also, favorable to the prospect of his safety. The plaintiff could not, we repeat, have been guilty of a want of ordinary care, *prima facie, in selecting a route which was ordinarily travelled with safety by all pedestrians going in the same direction.* If he was guilty of contributory negligence at all, it was not in selecting the route, but in the want of care exercised in the act of walking, after he had made the selection." City Council of Montgomery v. Wright, 72 Ala. 411, 421, 422.

In an action for injury sustained in driving a team of mules with a wagon over a defective bridge, this court, in considering pleas of contributory negligence, said:

"Pleas 7, 8, and 10 alleged that with knowledge of the defect, plaintiff voluntarily chose to attempt to drive over the portion where the defect was, when there was an open and safe way on a different portion of the bridge, known to plaintiff. Walker v. John Smith, supra [199 Ala. 514, 74 So. 451]. The court sustained demurrer and required an amendment substituting 'negligently' for 'voluntarily.' It was pointed out in the case of Montgomery v. Wright, 72 Ala. 411, 47 Am.Rep. 422, that when the route selected was that ordinarily traveled with safety by persons traveling as he was, it was not negligence prima facie to select it. Neither is it negligence as a matter of law voluntarily to select the route which is not the safest. It is, after all, a question of ordinary care, having regard to all the circumstances. One is not negligent in pursuing a course of conduct that an ordinarily prudent person would do under similar circumstances, although there was open to him a safer course. 45 C.J. 962; 20 R.C.L. 120. The selection of the course which is not the safer one is

only wrongful when a prudent person would not have done so. Therefore it does not follow as a legal conclusion that the selection of such course was wrongful, though voluntary, unless it was also negligent or contrary to the conduct of a reasonably prudent man. Negligence is the gist of the inquiry. 29 C.J. 702. There was no reversible error in requiring a statement in pleas 7, 8, and 10 that such conduct was negligent." Walker County v. Davis, 221 Ala. 195, 198, 128 So. 144, 147.

■■ We are of opinion that the fact that plaintiff had knowledge of conditions at the pit did not make him guilty of contributory negligence as a conclusion of law. The question is: Was the situation at the pit and the hazard to result from an attempt to walk across it so great that the plaintiff, with the knowledge of the situation, could not, as a reasonably prudent person, have elected to walk across it instead of taking some other way out of the building? This was a question for the jury. See Mosheuvel v. District of Columbia, 191 U.S. 247, 24 S.Ct. 57, 48 L.Ed. 170.

In an opinion in which the plaintiff had been injured by falling down dimly lighted steps in leaving a building, and defendant contended that plaintiff should have used another exit available to her, the Supreme Court of Pennsylvania made a statement which seems appropriate here, to wit:

" . . . . Under such circumstances the rule is that, if the alternative route has dangers of its own and the dangers of the route actually taken are not so great and obvious as to deter ordinarily prudent and careful people from using it, the question of contributory negligence is for the jury. (Citations Omitted)" Scurco v. Kart, 377 Pa. 435, 105 A.2d 170, 172.

■ Defendant says that the court erred in refusing the affirmative charge as to Count One wherein plaintiff charges that defendant negligently maintained "said

floor." Defendant says the evidence shows that the place where plaintiff slipped and fell was the pit, not the floor, and there is a failure of proof as to a material allegation in Count One. The tops of the pipes were approximately level with the floor of the unloading room. Trucks were driven over the pipes and people walked across them, according to the evidence. It is not unreasonable to conclude that the pipes were a part of the floor surface, although this part of the floor differed materially from other parts. The pipes were of the nature of a grating. Part of a floor might consist of a grating with open holes in it, yet, we do not think it would not be inaccurate to refer to the surface of the grating as part of the floor.

Defendant says that there is no proof that the pit was maintained for use of persons selling corn and entering and leaving the mill. We have already undertaken to show why the jury could find that the pit was included within the scope of the invitation to plaintiff.

As to Count Two, the allegations are that, "while still on the walkway," plaintiff slipped and fell and that defendant negligently maintained "said walkway adjacent to the place where Plaintiff slipped and fell in an unsafe condition . . . ." Defendant says there is no proof that the pit was a walkway and defendant was due the affirmative charge because of this failure of proof. We think that what has been said with respect to the pipes being part of the floor applies also as to the pipes being part of a walkway.

We are of opinion that the court did not err in refusing the affirmative charges requested by defendant or in overruling defendant's motion for new trial for the reasons urged by defendant and hereinabove referred to.

## VII.

Defendant contends that the verdict is excessive and that the motion for new trial should have been granted for that reason.

■ We forego lengthy and detailed recitation of the evidence as to plaintiff's injuries. He suffered severe laceration of his ear, a skull fracture, cerebral fluid was draining from his brain through the middle ear, and he had some blood and a large hole in his left eardrum. Plaintiff suffered a permanent hearing loss.[2] His medical expenses were approximately $600. Plaintiff spent a week in the hospital and was disabled for seven weeks. We do not think that we would be justified in setting aside the verdict on the ground that it is excessive.

## VIII.

Defendant assigns as error the refusal of defendant's requested charge which recites:

"7. The Court charges the Jury that you cannot award the plaintiff any damages for loss of profits in his business."

Defendant argues in brief:

"Appellee's testimony from R–50 through R–56 is concerned with alleged loss of profits in his dairy business. No claim is made in the complaint for loss of such profits and appellant was entitled to have consideration of this

2. The doctor testified:
"'Q Doctor, after the cochlea area of the ear has been injured does it heal itself without any residual effects?
"'A Once it's damaged it's permanent.
"'Q And, that would have been the case in the injury to Mr. Tanner, is that correct?
"'A Yes. And, you can predict right then and there that he will lose all of his hearing in that ear in almost 100 percent of the cases.
"'Q All right, sir, and it is your opinion based on examination, treatment and medical background, that Mr. Tanner will lose all the hearing in his . . .?
"'A Left ear.
"'Q . . . left ear, is that correct?
"'A Yes, sir, that's correct.
"' . . . . . . . . . .'"

matter excluded from the jury by proper instruction.

" . . . . Here, there were some seven pages of testimony as to the unclaimed damage, and the trial court's refusal to remove the matter from the jury's consideration constitutes reversible error."

In Mobile City Lines v. Proctor, 272 Ala. 217, 130 So.2d 388, ¶ [15–19], the trial court charged the jury that in estimating plaintiff's damages, they may take into consideration, among other elements, "doctors and medicine bills reasonably incurred," but the complaint did not allege that plaintiff had incurred any medical expenses nor claim damages therefor. This court held the charge bad in allowing recovery for special damage not alleged. In ¶ [20–22] of the opinion, this court said that special damages have to be set out and claimed in the complaint so that defendant may have proper notice of them and opportunity to prepare to meet them, citing Waters v. Weintraub, 255 Ala. 530, 52 So.2d 510.

So, in the instant case, if plaintiff did not claim loss of profits in his business in the complaint, but did introduce evidence showing that plaintiff had lost profits in his business, it may well be that defendant would have been entitled to have the court give his requested Charge 7, but we are not persuaded that plaintiff did introduce evidence that he had lost profits in his business.

In the complaint, plaintiff did allege as an item of special damage that " . . . he was unable to work and earn money for a long time and his earning ability in the future has been permanently impaired." The seven pages of testimony did have some probative force to show that plaintiff was unable to work and earn money for a long time and that his earning ability had been impaired. Defendant says on pages 41 and 42 of his brief:

"There was testimony concerning his dairy business (R–50–56), apparently offered in support of the claim in the complaint for loss of earnings, although there was no competent evidence that any earnings were lost. In any event, the testimony was too speculative and uncertain to form the basis of an award of damages. There was also evidence concerning the hiring of help at the dairy, but this was not claimed in the complaint and could not be included in the verdict. In fact, appellee's testimony showed that the profits from his dairy business were greater in the year following his injury than in the year before, and that he spent less than half as much for labor in the year following his injury than in the year before. (R–63)"

We accept defendant's statement that plaintiff's testimony showed that his profits were greater in the year following the injury than in the year before. It follows then that there is no evidence showing loss of profits in plaintiff's business. There is no pleading claiming damages for such loss of profits.

In Vest v. Gay, 275 Ala. 286, 154 So.2d 297, ¶ [9], the defendants argued that the trial court erred in refusing their requested charge to effect that the jury could not award plaintiff any damages for the purpose of compensating him for loss of salary or wages. This court held that the charge was properly refused as abstract because " . . . there was no claim in the complaint for damages for any loss of wages plaintiff might have suffered, nor was there any proof of loss of wages." Accordingly, defendants' Charge 7 in the case at bar was refused without error because there was no claim in the complaint for loss of profits, nor was there proof of any loss of profits.

## IX.

Defendant assigns as error the overruling of his objection to the admission into evidence of three exhibits offered by plaintiff and also the overruling of defendant's objections to two questions propounded to Dr. Warren, a physician whose

specialty is eye, ear, nose, and throat work. His testimony was taken by deposition. He had treated and examined plaintiff from time to time during the period from March 4, 1966, through October 5, 1967.

We consider first the overruling of objections to admission of the three exhibits. Each exhibit appears to be a graph on which the lines indicate plaintiff's ability to hear, that is: "HEARING LEVEL IN DECIBELS." Dr. Warren testified:

> "'Q All right, sir, would you explain to us what this card indicates?
>
> "'A It indicates a nerve type or perceptive type loss of hearing in the left ear which is characteristic of injury to the inner ear.
>
> "'Q Doctor, was this . . .?
>
> "'A Primarily the inner ear.
>
> "'Q Was the hearing studies that you made directed by you personally?
>
> "'A Yes, I didn't do it but my nurse did it at my direction and she is well trained.
>
> "'. . . . . . . . . .' "

He testified further that the entries on the exhibits were made in the regular course of business, are routine with this type of injury, were made shortly after the occurrence depicted on them, and that the records were kept in the usual course of business.

§ 415, Title 7, Code 1940,[3] provides that certain records made in the regular course of business may be admitted in evidence and that ". . . . circumstances of the making of such . . . . record, includ-

ing lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term, 'business' shall include business, profession, occupation, and calling of every kind."

Defendant says in brief:

"Here, while the tests were relevant, it is the contention of appellant that they were not properly authenticated. There was no evidence that the witness was present when the tests were taken and the nurse who took the tests did not testify as to the manner of their taking."

In considering the admissibility of a hospital record which had been made by a doctor who did not testify, this court said:

". . . . Appellant insists that it was error—a violation' of the hearsay rule—to receive evidence of the diagnosis made by Doctor Russakoff, who did not testify. Our view is that, under the provisions of Code 1940, Tit. 7, § 415 such evidence was properly received. . . . ." Bailey v. Tennessee Coal, Iron & Railroad Company, 261 Ala. 526, 530, 75 So.2d 117, 120.

We are of opinion that the three instant exhibits were admitted without error.

In Mobile City Lines v. Proctor, 272 Ala. 217, 130 So.2d 388, [4, 5], cited by defendant, this court held it error to permit the witness to testify as to what X-rays showed without producing the X-rays; but *Proctor* is not in point here because the records were produced and offered in evidence in the instant case.

---

3. § 415, Title 7, Code 1940, recites:
 "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible in evidence in proof of said act, transaction, or event, if it was made in the regular course of any business, and it was the regular course of the business to make such memorandum or record at the time of such act, transac-

tion, occurrence, or event, or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term, 'business' shall include business, profession, occupation, and calling of every kind."

Overruling objections to questions to the physician asking him what the exhibits indicated is next in order.

Examination of the exhibits, without explanation by a witness who understands them, is of little value to this court, and we doubt that a jury would find them helpful without explanation.

In argument of counsel, the instant exhibits have been compared with X-rays. In Demopolis Telephone Co. v. Hood, 212 Ala. 216, 102 So. 35, [12, 13], this court said:

"The evidence afforded by the advance of science, in making discovery of the hitherto unseen and unknown, is generally admitted in American jurisprudence. The reason is obvious. Accordingly, X-ray photographs showing the bony structure of the human body, when proven to be taken by a competent person, and properly identified, are admitted in evidence for the purpose of showing injuries or the presence of foreign objects. (Citations Omitted)

". . . . We are persuaded such photographs may be much more valuable evidence when explained to the jury from the stand by a person skilled in reading them, giving the angle at which they were produced, and the special appearance of the part involved indicating injury vel non. . . . ." (212 Ala. at 219, 102 So. at 37) See: Crocker v. Lee, 261 Ala. 439, 74 So.2d 429, ¶ [18].

 We think that explanation of the instant exhibits by an expert witness makes the exhibits more valuable and that the court did not err in overruling defendant's objections to the questions propounded to the physician regarding what the exhibits indicate to him.

## X.

Defendant assigns as error refusal of his requested Charge 9 to effect that if the jury are reasonably satisfied from the evidence that plaintiff was injured at a place where he was not invited to be, then he was not an invitee at such place and verdict must be for defendant.

We are of opinion that Charge 9 was refused without error because it was sufficiently covered by the oral charge.

## XI.

Defendant's refused Charge 11 was covered by given charges.

## XII.

Defendant's refused Charge 17 was covered by defendant's given Charge 16.

Affirmed.

HEFLIN, C. J., and SIMPSON, BLOODWORTH and McCALL, JJ., concur.