450 So.2d 1085 (1984)
SUNGAS, INC.
v.
Joseph PERRY and Nancy Perry.
82-808.
Supreme Court of Alabama.
April 6, 1984.
J. Pelham Ferrell of Ferrell, Davenport & McKoon, Phenix City, for appellant.
Charles E. Floyd and C. Kerry Curtis, Phenix City, for appellees.
JONES, Justice.
This is an appeal from a final judgment in a negligence action, wherein a jury awarded Plaintiffs/Appellees Joseph Perry and his wife Nancy $60,000 and $15,000, respectively, for the alleged negligence of Defendant/Appellant Sungas, Inc., a dealer/supplier of propane gas and tanks.
Plaintiffs alleged that Sungas was negligent in the following particulars:
(a) In filling the Perrys' tank with propane gas while it was painted a reddish brown primer color;
(b) In failing to give them any instructions or warnings about the hazards surrounding, concerning, or involving the use of their propane tank after the Defendant had filled it with propane gas while it was painted a reddish brown primer color;
*1086 (c) In failing to provide them with information concerning or relating to the pressure release valve as to the fact that it might discharge when making a hissing kind of sound, and that it would be dangerous for anyone to be either in the close vicinity of, or immediately above, the release valve under such circumstances;
(d) In failing to provide an adequate safety training program for its employees so that owners of propane tanks serviced by employees of Defendant would be adequately informed of any dangers or improper conditions existing about their tanks; and
(e) In failing to require that its employees have a thorough knowledge of all applicable rules and regulations of the Alabama LP-Gas Board.
Plaintiffs further alleged that, as a proximate consequence of Sungas's actions, Joseph Perry had both temporary and permanent injuries to his eyes; that he incurred hospital and doctors' costs, as well as other related expenses; that he lost time and wages; that his earning capacity was reduced; that he was caused physical pain and mental suffering, and other incidental injuries.
Nancy Perry, in a derivative claim, sought damages for loss of society and companionship of her husband, as well as for "time from work in caring for him."
Sungas answered Plaintiffs' claims as follows:
(a) It admitted that it was engaged in the sale, inspection, and maintenance of propane tanks and the sale and distribution of propane gas. It denied, however, that it sold or delivered the propane tank in question to the Perrys.
(b) It admitted putting gas in the tank and that its employee had special knowledge of safety measures relating to hazards involved in the use of propane tanks.
(c) It denied any negligence or wantonness on its part.
(d) It alleged contributory negligence and assumption of the risk on the part of Joseph Perry.
(e) It averred that it was not the insurer of Joseph Perry's safety and that it was lawfully entitled to rely on the reasonable anticipation that the Perrys would exercise care to prevent injury to themselves.
A jury found in favor of Plaintiffs on their negligence claims and assessed damages. Defendant appeals from the denial of its post-judgment motions for judgment notwithstanding the verdict or for a new trial. We affirm.

FACTS
As part of its services, Sungas installs and periodically fills and refills propane receptacles. The Perrys purchased a propane tank in 1976, and moved it to their residence. Although not the original retailer, Sungas, at the Perrys' request, installed the tank and connected it to the main line in October 1978. At the time of its purchase and installation, the tank was silver or aluminum in color.
According to the Perrys, at the time of the tank's installation, Sungas failed to provide either of them with any oral or written information concerning the proper use and maintenance of the propane tank. At some point in either 1978 or 1979, Joseph Perry painted the tank with red "rust colored" primer. In March of 1981, while the tank was still painted "red" or "rusty," Harold Anthony, route driver for Sungas, serviced and filled the Perrys' tank.
On June 21, 1981, while in his yard, Joseph Perry detected the smell of gas in the vicinity of his tank. He approached the tank and heard a "hissing" noise. He removed the "bonnet" from the tank in an effort to determine the source of the suspected leak. When he lifted the "bonnet," a gauge underneath it registered between 235 and 250, which he understood to mean "gallons" of propane gas. He also understood that his tank's capacity was 250 "gallons."
Joseph Perry testified as follows:
"Q. What did you do once you looked and saw the valve ... this release *1087 thing that you later found out was a release valve? What did you do once you saw it?
"A. I went in the shed and got a pipe wrench and I was going to try to tighten it. I pulled on it and nothing happened; it kept hissing, so I throwed the pipe wrench on the ground.
"Q. Did you pull on it more than once?
"A. I pulled on it one time and seen that it didn't move. I knowed that it was coming from somewhere but I seen that I wasn't going to move it. And while I was looking around, boom ... and it knocked me against that little house.
"Q. Were you looking down at anything at the time it did it?
"A. I must have been, but I don't remember. I know I was looking all around down there. I don't know whether I was looking straight down on it."
As a result of the sudden release of pressure from the tank, propane gas and foreign particles were thrown in both of Joseph Perry's eyes. He was hospitalized from June 21, 1981, through June 30, 1981. He was required, because of his injuries, to wear patches over both eyes for approximately a month after the incident. Additionally, subsequent to removal of the patches, he was unable to go out into bright sunlight for some six months because of the corresponding discomfort. According to testimony from his treating physician, Joseph Perry sustained a 16.4% permanent partial loss of vision in his right eye as a result of the accident.
Joe Scoggins, an investigator for the Alabama LP-Gas Board, investigated the accident in which Plaintiff was injured two days after its occurrence. At the time of his arrival, Plaintiffs' propane tank had been painted an aluminum color by Sungas's deliveryman, Harold Anthony. According to Scoggins, Sungas should not have filled the Perrys' tank at a time when it was painted "red" or "rusty" colored. He further stated it to be common knowledge among gas distributors that all tanks should be painted a light reflective color, preferably aluminum, to reflect heat and prevent excessive pressure build-up inside the tanks themselves. Additionally, his testimony was to the effect that the subject tank, which was filled in late winter and was still near 80% full, had the potential in hot weather to heat up and expel fuel through the release valve, creating a hazard of injury to any person in close proximity to the tank when the expanded gas was released.
Both Harold Anthony, Sungas's deliveryman, and his brother, Denman Anthony, service manager for Sungas at the time of the accident, denied having violated any Alabama LP-Gas Board regulations by filling Plaintiffs' tank when it was painted "red" or "rusty" colored as opposed to a heat reflective shade of paint.

DECISION
TG & Y Stores v. Atchley, 414 So.2d 912 (Ala.1982), states the familiar rule:
"In order to establish a cause of action for negligence, three elements must be shown. There must be a breach of a legal duty, there must be an injury, and the breach of duty must be the proximate cause of the injury. See Goodson v. Elba Baking Co., 408 So.2d 498 (Ala. 1981); Quillen v. Quillen, 388 So.2d 985 (Ala.1980).
". . . .
"The question of proximate cause is a question for the jury. Marshall County v. Uptain, 409 So.2d 423 (Ala.1981). It is the function of the jury to resolve disputed issues of fact. Fleming v. Kirkpatrick, 371 So.2d 16 (Ala.1979). The verdict of the jury is presumed to be correct [if supported by the evidence], and will not be set aside unless it is against the preponderance of the evidence. Trans-South-Rent-A-Car, Inc. v. Wein, 378 So.2d 725 (Ala.1979). The presumption of correctness is strengthened when, as in the present case, the trial judge refuses *1088 to grant a motion for a new trial." 414 So.2d at 914.
Given the injuries to Joseph Perry resulting from the incident in question, we must first look to the existence vel non of a "duty" on the part of Sungas to Plaintiffs in general. In Chilton Butane Gas, Inc. v. Marcus, 289 Ala. 292, 267 So.2d 140 (1972), we find the following:
"Those dealing with dangerous commodities, such as liquefied petroleum gas, must use a degree of care commensurate with the dangers involved; this degree of care is the same degree of care and vigilance which persons of skill and prudence observe under like conditions. Hall v. Dexter Gas Co., 277 Ala. 360, 170 So.2d 796; Graham v. North Carolina Butane Gas Co., 231 N.C. 680, 58 S.E.2d 757. This principle was expressed in the following language in 38 C.J.S. Gas § 38, p. 726:
"`The obligation resting on a gas company requires the exercise of ordinary care and prudence in the construction of its works and in the conduct of its entire business, so as not to endanger life and property. Thus employees of a gas company entering on the premises of another on business of the company are bound to use due care to avoid injuring the owner who is entitled to rely on the use of such care. * * *'
"The general rule, above stated, requiring the use of ordinary care and diligence on the part of a gas company, is applicable to its delivery of gas into the residence or other building of a consumer. Doxstater v. Northwest Cities Gas Co., 65 Idaho 814, 154 P.2d 498; Graham v. North Carolina Butane Gas Co., 231 N.C. 680, 58 S.E.2d 757; 38 C.J.S. Gas § 42, p. 735. But even though one who supplies and delivers liquefied petroleum gas is held to a duty of due care, he is not made an insurer. Instead, he may rely upon the reasonable anticipation that one who has ordered a delivery of gas to his premises will himself exercise care to prepare the premises for the safe receipt and use of the gas.
"There is wide agreement among authorities with respect to the scope of the duties of a supplier of gas. The following excerpts are illustrative of numerous authorities to a like result:
"`* * * Accordingly, the rule has been laid down that, in the absence of any fact on which to base an inference of duty, the failure of a gas company, on introducing gas into a dwelling on application, to inspect pipes or fixtures which were placed therein by the owner and over which the company has no control, is not negligence. The company is warranted in assuming that the interior system of pipes is sufficiently secure to permit the gas to be introduced with safety, and is not liable for injuries caused by leaks therein of which it had no knowledge. To render the company liable in such cases there must be facts alleged to show notice of defects, or facts from which an inference of duty to inspect arises either from contract, custom, or franchise. * * *' 38 C.J.S. Gas § 42, p. 736.
"`* * * [Authorities on the question] are to the effect that defendant in such cases is not under duty, unless employed for that purpose, to inspect pipes or fixtures which are placed in the dwelling by its customer or his contractors over whom defendant has no control, and that the furnisher of gas in such cases is warranted in assuming that the interior system of pipes is sufficiently secure to permit the gas to be introduced with safety. 28 C.J. p. 594, § 59, where many cases are cited. The rule may be different when the party furnishing gas knows that the interior arrangments are dangerously defective; but in this case there is no evidence sufficient to warrant a conclusion of such knowledge. * * *' Triplett v. Alabama Power Co., 213 Ala. 190, 191, 104 So. 248, 249. (Emphasis supplied.)
"`But, while a distributor of gas must exercise a high degree of care to see that no person is harmed in its distribution and while under its control, such responsibility *1089 is limited to the time the gas is in the company's own pipes, or containers, unless it has been allowed to escape, or having escaped, has created a dangerous hazard, known or which should have been known to a distributor, who has neglected to remedy the condition. * * *
"`* * * The owner or occupant of the premises is obliged to keep the pipe lines and equipment in repair or notify the company of their defective condition, otherwise the company is not liable for negligence. * * *' Doxstater v. Northwest Cities Gas Co., 65 Idaho 814, 827-828, 154 P.2d 498, 504.
"`"* * * But the duty, by reason of actual or constructive notice of some dangerous condition, must arise before the gas company can be found negligent for its failure to inspect or shut off the gas supply."' Wilson v. Home Gas Co., 267 Minn. 162, 173, 125 N.W.2d 725, 733.
"`One applying for gas is charged with the duty of keeping in good order the instrumentalities through which the gas is to be used, and which are under his control, such as appliances and pipes in the house, and the service line, and is required to use the appliances provided to shut off the gas, or to control the pressure, especially in times of emergency * * *' 38 C.J.S. Gas § 44, pp. 741-742.
"See Graham v. North Carolina Butane Gas Co., 231 N.C. 680, 58 S.E.2d 757, for a concise summary of these principles. Comparable principles have been applied to a supplier of electricity. City of Decatur v. Parham, 268 Ala. 585, 109 So.2d 692; Alabama Power Co. v. Jones, 212 Ala. 206, 101 So. 898.
"If a consumer of liquefied petroleum gas is under the above specified duties to maintain his premises and appliances in a manner which is safe for receipt and use of the gas, we can in good conscience see no reason he would not also be under a duty to maintain similarly safe conditions by his own conduct, such as his manipulation of or handling of those appliances. Pursuant to this duty, we feel that it is clearly the responsibility of a consumer who has ordered a delivery of gas to shut off valves on any gas appliances through which the gas might escape into his premises and create a hazardous condition."[1] 289 Ala. at 296-297, 267 So.2d 140.
The determination as to the existence vel non of a duty resting upon a defendant is a question of law for the trial judge. The rule adhered to in our jurisdiction is succinctly stated in 57 Am.Jur.2d Negligence § 34 (1971):
"The determination of any question of dutythat is, whether the defendant stands in such relation to the plaintiff that the law will impose upon him an obligation of reasonable conduct for the benefit of the plaintiffhas been held to be an issue of law for the court and never one for the jury."
Viewing the legal principles governing the obligations of Sungas in light of the facts and circumstances of record, particularly the expert evidence, we hold that the question of law regarding Sungas's legal duty was properly resolved in favor of the Plaintiffs. On the other hand, questions regarding breach of that duty, contributory negligence, and proximate cause are ordinarily questions of fact for the jury. Hall v. Booth, 423 So.2d 184 (Ala. 1982); Gross v. Republic Steel Corporation, 400 So.2d 383 (Ala.1981).
Having determined, and we think rightly so, the existence of a duty on behalf of Sungas running to these Plaintiffs, the trial judge properly submitted genuine issues *1090 of material fact relating to the breach of duty, contributory negligence, and proximate causation to the jury under appropriate instructions.
Whatever the strength of Sungas's factual assertions on appeal, we are unable to glean, from our thorough analysis of the record, any reversible error in the proceedings below.
In conclusion, we address the point made by the dissent. The dissent takes issue with the majority's interpretation of the trial court's order, dated January 24, 1983, as a final judgment (set out in full in the dissent). Admittedly, the literal wording of this order"The judge ... entered the judgments against the defendant"is less than perfect in form. To be sure, the division among the members of this Court as to this procedural issue could have been avoided if the judge had recited "Therefore, pursuant to the jury verdicts, judgments are hereby entered against the defendant in favor of the respective plaintiffs as follows: ... costs taxed against the defendant. [signed]." While we would have preferred a more perfect judgment recital, nevertheless, considering the whole record, we find the language of the order appealed from sufficiently clear to indicate an "intention to adjudicate" and to indicate the "substance of the adjudication." See Rule 58(b), A.R.Civ.P.
Accordingly, this cause is due to be, and it hereby is, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, ALMON, SHORES and BEATTY, JJ., concur.
FAULKNER, EMBRY and ADAMS, JJ., dissent.
EMBRY, Justice (dissenting):
Because I consider this court to be without jurisdiction to review this case, I dissent.
This is an attempt to appeal from the following:
"1/24/83 Trial commenced to a jury of twelve on January 24, 1983. Upon the conclusion of the trial, the jury returned the following verdicts: `We, the jury, find for the plaintiff, Joseph Perry, and assess his damages against the defendant at $60,000.00. Dated January 25, 1983. Richard W. McLendon, Jr., Foreman.' and `We, the jury, find for the plaintiff, Nancy Perry, and assess her damages against the defendant at $15,000.00. Dated January 25, 1983. Richard W. McLendon, Jr., Foreman.' The judge polled the jury and, being informed that the verdict was that of each juror, entered the judgments against the defendant as directed by the jury verdicts. [Emphasis added.]
 "s/Paul J. Miller, Jr.
 "Circuit Judge"
In fact, a careful search of the record shows there was no judgment entered.
In my opinion the above will not support an appeal and therefore this court is without jurisdiction to entertain this attempted appeal. § 12-22-2, Code of 1975.
FAULKNER and ADAMS, JJ., concur.
NOTES
[1] Two points concerning Chilton Butane Gas, supra, are worthy of note: First, the judgment was reversed on common law pleading grounds, not here in issue; and, second, we are aware that portions of the language quoted therefrom relate to "interior systems of pipes." Although the factual context of the instant case does not involve "interior systems of pipes," we have included this language because of its potential value by way of analogy in the analysis and evaluation of the respective duties of the customers and the suppliers of liquefied gas in general.