555 So.2d 88 (1989)
Michael L. JOHNSON
v.
NIAGARA MACHINE AND TOOL WORKS, et al.
88-912.
Supreme Court of Alabama.
November 17, 1989.
*89 Robert E. Kirby, Jr. of Emond & Vines, Birmingham, for Appellant.
Richard E. Smith of Rives & Peterson, Birmingham, for appellee Niagara Mach. & Tool Works, Inc.
Samuel H. Franklin and Mac M. Moorer of Bradley, Arant, Rose & White, Birmingham, for appellees Howell Redwine, Ronnie Alley and Sidney Morgan.
William A. Mudd of McDaniel, Hall, Conerly & Lusk, Birmingham, for appellee Modern Machinery Associates, Inc.
HORNSBY, Chief Justice.
The plaintiff appeals from a summary judgment in favor of all defendants. The trial court wrote no opinion; it simply entered its judgment on the case action summary sheet, without explanation as to why the summary judgment was granted. This action was filed prior to June 11, 1987; therefore, the "scintilla rule of evidence" applies. See Code 1975, § 12-21-12.
The facts of the case show that the plaintiff, Michael Johnson, was severely injured in the operation of an E-150 industrial die press manufactured by defendant Niagara Machine and Tool Works (hereinafter "Niagara") and distributed by defendant Modern Machinery Associates, Inc. (hereinafter "Modern"). Johnson used the press to manufacture a plate that is used in the mining industry as roofing support. The manufacturing process required Johnson to feed raw steel stock into the press. The press then cut the stock into plates, and several plates could be produced from a single piece of stock. At the end of a cycle in which a piece of stock was put through the press, waste steel would be left in the *90 operating area of the press ram. That waste would have to be removed with a hand-tool or with the naked hand.
Johnson was injured by a large cutting tool attached to the press ram. His machine had been operating in a "continuous" mode, in which the ram came down at a rate of 60 strokes per minute. The machine had just finished cycling a piece of stock, and there was waste material left in the area of the press ram. There was evidence that Johnson then hit the "stop" button on the operator's station and reached into the ram area to retrieve the waste. The ram, however, failed to cease operation, and Johnson's hand was amputated by the cutting tool attached to the press ram.
Johnson sued the press manufacturer and distributor under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") and alleging breach of warranty, and he sued certain co-employees for an alleged negligent or wanton failure to provide him with a safe workplace, relying on Code 1975, § 25-5-11. Specifically, Johnson's complaint alleges, with regard to Niagara, that the press involved in this accident was unreasonably dangerous due to design or manufacturing flaws, although the complaint does not specify what those flaws were. The complaint also alleges that Niagara negligently or wantonly failed to warn Johnson of the dangers that were inherent in the use of its press due to an alleged negligent or wanton design thereof.
We begin our analysis by noting that summary judgment is controlled by A.R. Civ.P., Rule 56, which states that, in order for summary judgment to be proper, there must be no genuine issue as to any material fact and the movant must be entitled to a judgment as a matter of law. We will consider this summary judgment separately as to the products liability and the co-employee aspects of the suit.

Products Liability (AEMLD) Claim
Johnson sued Niagara and Modern under the AEMLD. This doctrine had its inception in the case of Casrell v. Altec Indus., Inc., 335 So.2d 128 (Ala.1976). In Casrell, we laid down a new rule with respect to products liability law. Therein we stated:
"To establish liability, a plaintiff must show:
"(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
"(a) the seller is engaged in the business of selling such a product, and
"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"(2) Showing these elements, the plaintiff has proved a prima facie case although
"(a) the seller has exercised all possible care in the preparation and sale of his product, and
"(b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller.
"By extending the doctrine of manufacturer's liability, we are not invading the province of the Legislature. Developing case law is a proper role for this court, and that is what we are doing in this case. We are here removing the defense of due care in the manufacture and sale of the product. The care with which a defective product is manufactured and sold is now immaterial, when given the allegation and proof of injury resulting proximately from the product's defective condition."
Casrell 335 So.2d at 132-33. In Casrell, we also set out certain defenses applicable under the AEMLD:
"Ordinarily, defenses fall into two categories: (1) general denial, and (2) affirmative defenses.
"Under the general denial defense, the defendant may offer evidence to counter plaintiff's prima facie case. For example, where plaintiff's evidence [indicates] that the product was defective when it left the manufacturer's control and possession, *91 the manufacturer can rebut this evidence, proving the defect, if any, occurred while in the possession or control of the distributor or retailer. Moreover, the defendant may affirmatively show that it did not contribute to the defective condition, had no knowledge of it, and had no opportunity to inspect the product. In other words, [that] there was no causal relation in fact between his activities in handling the product, and its defective condition. But, this `lack of causal' relation defense is not to be understood as being available to a manufacturer, where the defect is in a component part, or to a defendant who distributes a product under its trade name. Sears, Roebuck & Co. [v. Morris, 273 Ala. 218, 136 So.2d 883 (1961)]. The defendant may assert the negligent conduct of the plaintiff in using the product, as well as the defense of assumption of risk. [Cf. Restatement (Second) of Torts (1966), § 401A, comment k.]"
Id. at 134.
Niagara and Modern moved for summary judgment, alleging numerous grounds. Niagara argues in its brief in support of its motion that the press had been substantially modified once it left Niagara's control and, therefore, that Niagara had no duty to warn Johnson about the dangers of using the press. Modern's motion incorporated the arguments of all other defendants by reference and further alleged, through affidavit, that, while it distributed the machine, it had never had possession of the machine and that none of its agents or employees had ever worked on the machine. By incorporating the other defendants' motions, Modern made a claim of contributory negligence against the plaintiff, Johnson.
With respect to Niagara's claim of substantial modification, we note that a defendant may defeat a plaintiff's claim by showing that the defect, if there was one, "occurred while the product was [in] the possession or control of the distributor or retailer." Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976). Here, however, the distributor specifically asserts that it never had possession or control of the machine but that the machine was shipped directly to Johnson's employer from Niagara. Also, we find evidence to indicate that the E-150 model press was generally marketed in a "naked" configuration, which was easily modified. The press was sold with no safety equipment, i.e., with no guards or barriers. Thus, Niagara is in the seemingly anomalous position of arguing that the addition of a barrier guard to its naked device is a substantial change within the meaning of the AEMLD. Furthermore, evidence tended to show that Niagara had knowledge of the numerous possible applications of the machine and the many possible variations of the configuration of the machine. Niagara, however, did not participate in the numerous changes made to the machine by Johnson's employer. The modifications include the addition of a large flywheel and hub arrangement, a homemade automatic feed, a removable barrier guard, and a change in the location of the operator's station to the front of the press.
It is clear that in Alabama the mere fact that a product has been modified by the buyer subsequent to the sale does not always relieve a manufacturer of liability. In Industrial Chemical v. Hartford Acc. & Indem. Co., 475 So.2d 472 (1985), we stated:
"It is fair to hold the manufacturer (and its insurer) liable for bodily injury caused by a defect in the product, even though the product has been changed, if the injury was not caused by the change.
"It is equally fair to hold the manufacturer or its carrier liable for bodily injury caused by a defect in the product, even though the product is undergoing demonstration, installation, servicing, or repair, if these activities did not cause the injury."
Id. at 476. See also, Bullen v. Roto Finishing Systems, 435 So.2d 1256 (Ala.1983); Brown v. Terry, 375 So.2d 457 (Ala.1979).
Niagara argues, in effect, that it should not be liable for Johnson's injuries because the system into which the machine is integrated changes from buyer to buyer. Thus, Niagara argues that it is the duty of *92 the buyer/operator to select guarding equipment and safety devices, because, Niagara says, it is the buyer and not Niagara who designs the manufacturing system into which the press is integrated. The deposition of Stanton Cheyney, a Niagara corporate officer, indicates that it would be impossible for Niagara to design a guard system that would meet the needs of the many types of manufacturing systems into which the press may be fitted.
The United States Court of Appeals for the Fifth Circuit has followed this argument in the decision of Gordon v. Niagara Machine & Tool Works, 574 F.2d 1182 (5th Cir.1978). In Gordon that court stated: "Plaintiff contends, alternatively, that Niagara should be held subject to strict liability in tort under § 402(a), Restatement (Second) of Torts. Section 402(a) is a firmly settled principle in Mississippi's jurisprudence, and we regard this question, which was not reached in our prior ruling, to remain open on remand. It is first argued by plaintiff that the press, having been sold by the manufacturer without guarding devices, was, per se, in a defective condition unreasonably dangerous for the intended user. Although some jurisdictions appear to accept this contention, Bexiga v. Havir Mfg. Co., 60 N.J. 402, 290 A.2d 281 (1972); Rhoads v. Service Machine Co., 329 F.Supp. 367 (E.D.Ark.1971), we decline to find a multifunctional, general purpose machine, like the Niagara press, was in defective condition when marketed without guarding devices. The machine having been designed for many kinds of operation, it was incumbent upon the machine purchaser to select safety devices appropriate for his particular function. This procedure was the universal custom which prevailed in the industry in 1954, and ever since. Moreover, we are not convinced that any single device known to the power press industry in 1954, such as the mechanical interlock which Dr. Youngdahl described in his testimony, could have been designed to prevent repeat action of a press with a mechanical positive full-revolution clutch and an open back inclinable configuration to allow feeding of material from all four sides. Such a device would have materially curtailed the myriad uses for which Niagara's press was designed, manufactured and marketed. Ward v. Hobart Mfg. Co., 450 F.2d 1176, 1184-85 (5 Cir. 1971), applying Mississippi law. We are mindful, however, that in a proper case, the absence of warning to the user of a dangerous product can trigger § 402(a) liability. `[L]ack of an adequate warning, in itself, renders a product defective or unreasonably dangerous within the meaning of products liability law.' Martinez v. Dixie Carriers, [529 F.2d 457 (5th Cir.1976)] at 465, citing Alman Bros. Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc., 437 F.2d 1295, 1303 (5 Cir.1971); Davis v. Wyeth Laboratories, 399 F.2d 121, 126-27, 128-30 (9 Cir.1968)."
574 F.2d at 1189-90.
We are inclined to agree with the analysis of the Fifth Circuit on this matter. Unquestionably, it has been the custom in the industry for many years for the purchaser of general purpose machinery, such as the press involved here, to assume responsibility for installing a guard on the machine. Moreover, evidence in the record tends to show that both American National Standards Institute standards and Occupational Safety and Health Administration standards place this burden on the purchaser-user of such equipment. Furthermore, this ruling is supported by common sense. It would be an incredibly heavy burden for manufacturers to bear if they should be charged with responsibility for the possible negligence of a user-purchaser in designing the system into which their machines are integrated. To allow such a rule would require that manufacturers build and market only "perfect" products or continually inspect and monitor the use of machines they have sold. We do not believe that such a rule should become law in this state. Thus, we rule today, that Niagara is not liable under the AEMLD, because the E-150 press had been substantially modified after it left the control of Niagara. Niagara should not be charged with a duty to *93 guard or make safe all possible applications of its general purpose product. The possible application of a general purpose machine in a given manufacturing process not designed by the manufacturer is unforeseeable as a matter of law. Summary judgment is proper, therefore, in favor of both Niagara and Modern, on the AEMLD claim. Having held that summary judgment is proper because of unforeseeable modifications, we decline to reach the issue of whether Niagara provided an adequate warning of possible dangers to the user.

Co-Employee Claim
Johnson also sued three co-employees alleging negligent or wanton failure to provide a safe workplace. We note that Code 1975, § 25-5-11 now bars co-employee suits based on negligent or wanton failure to provide a safe workplace. However, the bar of § 25-5-11 is not applicable to Johnson's cause of action because the incident he complains of occurred prior to the effective date of this statute.
The co-employees' motion for summary judgment stated only one ground: contributory negligence. We believe summary judgment is improper as to these defendants.
We note at the outset that the question of contributory negligence is generally a question of fact for the jury. Sun Gas, Inc. v. Perry, 450 So.2d 1085 (Ala.1984). However, the conduct of the plaintiff in certain cases may be so lacking in reasonable care for his own safety that reasonable minds may not differ on the issue of the plaintiff's own negligence; in such a case the question becomes one of law. Elba Wood Products, Inc. v. Brackin, 356 So.2d 119, 124 (Ala.1978). Moreover, if there is a scintilla of evidence to the contrary, the question of contributory negligence must go to the jury. Id. See also, Central Alabama Elec. Co-op v. Tapley, 546 So.2d 371 (Ala.1989) (finding of contributory negligence as a matter of law requires that plaintiff put himself in danger and appreciate the danger consciously at the time he does so); Terry v. Life Insurance Co. of Georgia, 551 So.2d 385 (Ala.1989).
The case of Wallace v. Doege, 484 So.2d 404 (Ala.1986), describes the defendant's burden in proving contributory negligence:
"In order to prove contributory negligence, the defendant must show that the party charged: (1) had knowledge of the condition; (2) had an appreciation of the danger under the surrounding circumstances; and (3) failed to exercise reasonable care, by placing himself in the way of danger. Hatton v. Chem-Haulers, Inc., 393 So.2d 950 (Ala.1980); Baptist Medical Center v. Byars, 289 Ala. 713, 271 So.2d 847 (1972)."
Doege, 484 So.2d at 406.
In that case we held that the plaintiff Doege had been contributorily negligent as a matter of law. The evidence showed that the plaintiff had 25 years' experience in handling saws, that she had been instructed as to the proper method of cleaning the saw that injured her, that she was aware that no more than two persons had inspected the saw for safety, if it had been inspected at all, and that Doege knew she could be injured if she tried to clean the saw blade without stopping the saw. Consequently, we stated that the only conclusion to be reached was that Doege knew of the danger, appreciated it, and then put herself in danger by trying to clean the blade without turning the saw off. Id. See also Fenley v. Rouselle Corp., 531 So.2d 304 (Ala.1988) (plaintiff had been press operator for 10 years and was thoroughly familiar with operations of the press and the surrounding circumstances and knew that company policy required him to stop all power before attempting die change).
The record does not compel a finding of contributory negligence in the case at bar. There was evidence that Johnson had only a few months' experience in working at the press that injured him; that the only guard at the "nip point" of the press was easily detached, and that this guard did not reach all areas of the nip point; that the nip point could be entered from other unguarded directions; that a warning label at the control *94 station had been covered over; and that Johnson had not been trained to use handtools and was encouraged by management to operate the press as fast as he could. This evidence suggested that he used the press on a continuous cycle and often had to use his bare hand rather than a tool to remove scrap.
There was also evidence to indicate that up until the day of the accident safety rules were not enforced, and that other operators of presses did not use handtools and were not injured. See, Evans v. Tanner, 286 Ala. 651, 244 So.2d 782 (1971) (plaintiff is not contributorily negligent if he merely does what other prudent people do without injury). Johnson's deposition testimony states that he was never reprimanded for failure to use handtools to remove scrap; the evidence also indicates that other operators were not reprimanded either, although the practice allegedly was common. Moreover, Johnson's testimony shows that he asked for a copy of the press operator's manual but that none was ever supplied to him. Testimony also indicates that at "safety" meetings supervisory personnel stressed high production and gave little, if any, attention to safety matters. However, testimony does indicate that a safety meeting was held on the night of Johnson's accident and that at that meeting the proper use of handtools was stressed, although allegedly the rule regarding their use was not enforced. Evidence also indicated that before he reached into the nip point Johnson pressed the "stop" button in order to stop the press's cycle. After considering all of these factors, we find that there is at least a scintilla of evidence to show that Johnson was not contributorily negligent. Johnson may have been "heedless" of the danger presented by the press, but this does not rise to the level of contributory negligence as a matter of law. Decatur Light, P. & F. Co. v. Newsom, 179 Ala. 127, 59 So. 615 (1912). Therefore, summary judgment in reliance on a finding of contributory negligence as a matter of law was improper; whether Johnson was contributorily negligent was a question for the jury.
Accordingly, we affirm the summary judgment as to the AEMLD claims, and we reverse the summary judgment as to the co-employee defendants and remand for further proceedings not inconsistent herewith.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
JONES, SHORES and KENNEDY, JJ., concur.
MADDOX, ADAMS, HOUSTON and STEAGALL, JJ., concur in part and dissent in part.
ADAMS, Justice (concurring in part and dissenting in part).
Because I believe that the plaintiffs have stated a cause of action under the AEMLD, I dissent as to that portion of the opinion that affirms the summary judgment on that theory of the case. I concur in that portion of the opinion that reverses as to the co-employees.
HOUSTON, Justice (concurring in part and dissenting in part).
I concur with the affirmance of the summary judgment as to Niagara Machine and Tool Works and Modern Machinery Associates, Inc. I dissent as to the reversal of the summary judgment as to Howell Redwine, Ronnie Alley, and Sidney Morgan.
Johnson had knowledge and appreciation of the dangers associated with placing his hand into the operating press, as shown by his deposition testimony:
"Q. Mr. Johnson, how far into the press did you have to put your hand in order to get the scrap out?
"A. Five, six inches.
"Q. And, I guess you could tell when you put it in there that it was up under the ram, the portion of the press that came down?
"A. Yes, sir.
"Q. And, I guess you knew prior to the accident what would happen if the ram came down while your hand was in there, didn't you?
"A. Yes.

*95 "Q. You knew that would hurt your hand bad, didn't you?
"A. Yes."
With this knowledge and appreciation of the danger, Johnson, before his injury, removed the barrier guard that had separated him from the press:
"Q. Okay. Was there any kind of barrier or guard, Mike [Johnson], in place between where the operator stood in front of the controls and the ram of the press?
"A. Yes.
"Q. Tell me about that. What did it look like?
"A. A big screen, rectangle-shaped guard.
"....
"Q. Okay. Could the operator take that barrier down if he wanted to?
"A. Yes, sir.
"....
"Q. On the night of your accident, Mike, when you first started running the press, was that barrier up there in between where you were and the ram of the press?
"A. The guard?
"Q. If you want to call it that.
"A. Yes, sir.
"Q. Was that barrier up there at the time of your accident?
"A. No, sir.
"Q. Where was it?
"A. Laying on the floor.
"Q. Had you removed it and put it on the floor behind you?
"A. Yes."
I can find no evidence in the record of any need or reason for Johnson to remove this safety guard in order to operate the press.
There is a factual question as to whether Johnson could have injured his hand if the barrier had been in place; however, from viewing the videotape of the press that was viewed by the trial court, I think it evident that the barrier guard would have made it more difficult for Johnson to place his hand in the press and would have required the use of the hand tool or, at the least, would have made the removal of the scrap easier with the hook hand tool. Defendant Sid Morgan, in answer to questions from Johnson's counsel, testified as follows in his deposition:
"Q. When the guard, the barrier guard was on the press, was it situated so as to prevent entry of a hand into this point of operation, where Mike Johnson's amputation occurred?
"A. When barrier guards are on those presses, they are intended to prevent entry of a hand into the point of operation, yes, sir.
"Q. All I'm asking is, was this barrier guard located there at this particular point of operation, where if it had been on, it would have obstructed his hand from going in?
"A. If it had been on at that point in time, yes, sir, it would have prevented it.
"....
"Q. Is it your understanding that when the guard is affixed to this press in the manner you have described, that it would be effective in preventing an injury of the type Michael Johnson had, from entry into this point of operation?
"A. As I understand it, yes, it would.
"Q. In order to remove the tail stock from the point of operation, is it necessary to remove this guard?
"A. No, sir.
"Q. How can that be accomplished with the guard on?
"A. To follow the established procedure by picking up the removal hook, reaching around the end of the guard, reaching to the tail stock, hooking the point of the hook into a hole that is in each piece of tail stock and pulling it from the die set, allowing it to fall into the discharge chute.
"Q. Is it possible to reach around the barrier guard and put your hand in the point of operation?
"A. Not in my opinion, no, sir.
"Q. Why is it possible to reach around the barrier guard and put a hook in the point of operation, but it is not possible to reach around the barrier *96 guard and put a hand in the point of operation?
"A. Because the hook extends one's reach approximately eighteen inches to two feet. The proximity of the die set is such with the barrier guard in place, that it was not reachable in my opinion by the bare hand."
Therefore, if Johnson had not removed the barrier guard, it would have been more difficult for Johnson to have injured his hand, if he could have injured his hand at all. By removing the barrier guard for no articulated reason, Johnson, with knowledge and appreciation of the danger, exposed himself to a dangerous condition.
In addition to this, Johnson, at the time of his accident, failed to use the hook that press operators were supposed to use in lieu of placing their hands anywhere near the point of operation of the press. Johnson testified in deposition:
"Q. What was said about safety that you remember during that meeting that took place the night of your accident?
"A. To be careful, to use your hooks.
"....
"Q. All right. And I guess that was Ronnie [Alley, a defendant] that urged everybody to use their hooks, is that right?
"A. Yes, sir.
"Q. All right. And prior to the time that Ronnie mentioned using those hooks, had you ever seen those hooks out there?
"A. Yes, sir.
"Q. All right. Had you ever used them?
"A. On occasion.
"Q. All right. When did you use them, how would you use them?
"A. To pull a piece of scrap out.
"Q. Okay. Pull a piece of scrap out after your press had operated and pressed out a plate?
"A. Yes, sir.
"....
"Q. And Mr. Ronnie Alley sitting down to my right also, he never gave you any warnings or reprimands regarding any of your work practices there at Birmingham Bolt prior to your accident?
"A. Yes, sir.
"Q. What did he say to you?
"A. The night of my accident, he said use hooks, that was the only thing he discussed.
"Q. He told you that the night of your accident?
"A. Yes, sir.
"Q. And you were not at the time of your accident using a hook, were you?
"A. No, sir.
"....
"Q. What about the hook, Mike [Johnson], was the hook there, too, at the time of your accident?
"A. Yes.
"Q. Was it behind you also next to the barrier?
"A. No, sir.
"Q. Where was the hook?
"A. Lying right in front of me."
Thus, at the time of his accident, Johnson had personally removed the barrier guard that was designed to keep press operators, such as Johnson, from getting their hands near or into the point of operation of the press. In addition, for whatever reasons, Johnson had elected not to use the hook handtool "lying right in front" of him, even though use of the hooks had been stressed at a safety meeting attended by Johnson on the very night of his accident.
Mr. Stanton Cheyney, an expert witness on presses, testified as follows regarding these actions by Johnson:
"Q. And it's correct, isn't it, Mr. Cheyney, that while operating a press, a press operator should never remove barrier guards that have been placed there to protect him from the point of operation of a press?
"A. That is true.
"Q. The removal of a safety guard from the press is not, is it, a safe and prudent action for a press operator to do while operating the press?
"A. That is true.
"Q. You would agree, wouldn't you, that the removal of a safety guard put *97 there for the protection of the worker is not a reasonable and safe practice for an operator while he's running an E 150 press?
"A. I would agree.
"Q. Now finally, Mr. Cheyney, the use of hand tools by a press operator is a recognized and recommended safety practice in certain applications, correct?
"A. True.
"Q. And the use of hand tools as a practice would help prevent and avoid accidents such as this one, correct?
"A. True.
"Q. And if hand tools had been used properly by the press operator in this case his injury would not have occurred, correct?
MR. KIRBY: Object.
"A. True.
"Q. And would you agree, Mr. Cheyney, that it is always a good practice from the standpoint of safety for a press operator to use his hand tools as instructed in operating a press?
"A. Absolutely."
Johnson's removal of the barrier guard and his failure to use the hook handtool not only contributed to, but directly caused, his injury.
Johnson's cryptic description of the accident fails in any way to justify or explain his actions of removing the safety guard, failing to use the hook, or placing his hand into the point of operation of a 120,000-ton pressure press operating at a rate of almost 60 strokes per minute. At his deposition, Johnson testified as follows:
"Q. ... Now, tell me how your accident happened.
"A. I was running the press.
"Q. Okay.
"A. Steel come to an end. I hit the stop button, stuck my hand in there. It cut it off.
"Q. Why did you put your hand in there?
"A. To bring out the scrap."
Unless we are to overrule cases recently decided by this Court, e.g., Rowden v. Tomlinson, 538 So.2d 15 (Ala.1988) (applying the "substantial evidence" doctrine); Fenley v. Rouselle Corp., 531 So.2d 304 (Ala.1988); Wallace v. Doege, 484 So.2d 404 (Ala.1986), we must conclude that Johnson's failure to exercise reasonable care in operating the press, coupled with his knowledge of the obvious danger, renders him contributorily negligent as a matter of law.
Therefore, I would affirm the trial court's summary judgment on behalf of all defendants.
MADDOX and STEAGALL, JJ., concur.