736 So.2d 571 (1999)
Kimberly McGREGORY et al.
v.
LLOYD WOOD CONSTRUCTION COMPANY et al.
Annette Savors et al.
v.
Lloyd Wood Construction Company et al.
Nos. 1971648 and 1971649.
Supreme Court of Alabama.
April 2, 1999.
Rehearing Denied May 21, 1999.
*572 Leila H. Watson of Cory, Watson, Crowder & DeGaris, P.C., Birmingham, for appellants.
John A. Owens, M. Bradley Almond, and Anna Northington Hutcheson of Owens & Almond, L.L.P., Tuscaloosa, for appellee Lloyd Wood Construction Company, Inc.
S. Allen Baker, Jr., R. Bruce Barze, Jr., and Charles A. Burkhart of Balch & Bingham, L.L.P., Birmingham, for appellee Alabama Power Company.
HOUSTON, Justice.
Kimberly McGregory and Brittany McGregory, minor dependents of Jesse Gibbs, suing by and through their mother, Geneva McGregory; and Annette Savors, as administratrix of the estate of Eugene Bush, and Scarla Savors, a minor dependent of Eugene Bush, suing by and through her mother, Annette Savors, appeal from judgments in two wrongfuldeath actions. These two actions were tried together. Both actions were based, in part, on allegations of negligence and wantonness on the part of Lloyd Wood Construction Company, Inc. ("Lloyd Wood"), and Alabama Power Company ("APCo").[1] We affirm.
Eugene Bush and Jesse Gibbs were killed at a construction site on Watermelon Road in Tuscaloosa County when they came in contact with electricity passing through an uninsulated high-voltage power line owned by APCo. Lloyd Wood was the general contractor for the construction project; Bush and Gibbs were employees of a subcontractor, Harpole Steel Buildings, Inc. ("Harpole"), which had been hired to erect a building on the site.
The building was situated approximately six feet from the northern property line of the site. APCo's power line ran along the length of that property line, approximately 28 feet above the ground. The accident occurred when a steel cable attached to a crane contacted the power line; Harpole owned the crane and the Harpole crew had been using it to move scaffolding. Because the scaffolding was too heavy to move by hand, the crew had attached the crane's cable to the scaffolding and had used the crane to move it from point to point around the building as needed. The cable had been left attached to the scaffolding between the moves. Contact with the power line occurred when the crew was working close to the power line and the boom on the crane "leaked down" (i.e., lowered) because of a problem in the crane's hydraulic system. The Harpole crew had been aware of the problem in the boom for two to three years before the accident. Gibbs, who was standing on the scaffolding when the steel cable contacted the power line, was electrocuted immediately. Bush was electrocuted when he came to aid Gibbs and touched him while he was still in contact with the scaffolding. APCo had not been notified that a crane would be used in close proximity to the line, and it had not been asked to insulate *573 or de-energize the line or to take any steps to protect the Harpole crew.

The Claims Against Lloyd Wood
The plaintiffs' complaints were based, in part, on allegations that Lloyd Wood had breached a duty to maintain a safe workplace for the employees of its subcontractors. Specifically, the plaintiffs alleged that Lloyd Wood had failed to adequately warn Bush and Gibbs of the danger posed by the power line or to protect them from that danger. The trial court entered a partial summary judgment for Lloyd Wood, stating:
"With respect to the `Renewed Motion for Summary Judgment On Behalf of Defendant, Lloyd Wood Construction Co., Inc.,' the Court had reviewed prior to said hearing all submissions in support of, and in opposition to, the same. At the hearing, the Court heard extensive argument from [the plaintiffs' attorney] and [from Lloyd Wood's attorney].
"The Court finds that there is no genuine issue of material fact relevant to the general claims and theories of liability asserted against Lloyd Wood Construction Co., Inc., by the Plaintiffs in these cases and that said Defendant is entitled to judgment as a matter of law as to said general theories and claims. However, the Court does not find that all genuine issues of material fact have been eliminated with respect to the respective Plaintiffs' claims and theories of liability predicated on the duties and obligations which might legally be deemed to arise out of the `Projects Northport, Alabama Area Accident Prevention & Safety Plan' promulgated by Lloyd Wood Construction Co., Inc. At this point, the Court is unable to state with precision exactly what the cleavage will be between the precluded causes of action and theories of liability, with respect to which it is granting summary judgment at this time, and the independently existing causes of action and theories of liability which might be legally cognizable as emanating from the duties and responsibilities committed to and assumed by Lloyd Wood Construction Co., Inc., by said `Plan' and the posting and other publication of the same. Further, the Court is not committing that any causes of action or theories of liability predicated on the commitments and undertakings contained in said document would survive a motion for a judgment as a matter of law made at an appropriate point during trial. Rather, the Court is simply stating that, at this summary judgment stage, the Court considers that genuine issues of material fact remain with respect to causes of action and theories of liability which might be premised on said document and its involvement in the relationships and circumstances underlying these cases.
"In conclusion, what the Court is now saying is that any cause of action or theory of liability upon which the Plaintiffs are allowed to proceed at trial will have to be legally premised and predicated on, and legally arise out of, the undertakings of Lloyd Wood Construction Co., Inc., established by said `ProjectsNorthport, Alabama Area Accident Prevention & Safety Plan.'"
The case proceeded to trial on the "theories of liability predicated on the duties and obligations which might legally be deemed to arise out of the `Projects Northport, Alabama Area Accident Prevention & Safety Plan'" ("the safety plan") promulgated by Lloyd Wood. The jury was instructed to determine whether Lloyd Wood was liable for negligence (the trial court had dismissed the wantonness claim) in its performance of a duty assumed under the safety plan. The jury was also instructed to determine whether negligence on Gibbs's part had contributed to his death. The jury returned a verdict for Lloyd Wood; the trial court entered a judgment on that verdict.
Three issues are presented in regard to the claims against Lloyd Wood:
1) Whether the trial court erred in entering the partial summary judgment;

*574 2) Whether the trial court erred in ruling that the plaintiffs waived their objection to the composition of the jury, an objection based on the holding in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and,
3) Whether the trial court erred in instructing the jury on Ala.Code 1975, § 37-8-52.
With respect to the first issue, we note that the duty generally owed by a general contractor to warn a subcontractor of dangers in the workplace was discussed in Breeden v. Hardy Corp., 562 So.2d 159 (Ala.1990):
"`As invitor, ... the general contractor[] was under a duty to have the premises free from danger, or if they were dangerous, to give its invitee [the employee of the subcontractor], sufficient warning to enable him, through the exercise of reasonable care, to avoid the danger. This duty includes the duty to warn the invitee of danger of which the invitor knows or ought to know, and of which the invitee does not know. Secrist v. Mark IV Constructors, Inc., 472 So.2d 1015 (Ala.1985); Southern Minerals Co. v. Barrett, 281 Ala. 76, 199 So.2d 87 (1967); McLeod v. McBro Construction Co., 525 So.2d 1353 (Ala.1988).
"`A general contractor is not responsible to a subcontractor for injury from defects or dangers which the subcontractor knows of, or ought to know of. "If the defect or danger is hidden and known to the owner, and neither known to the [sub]contractor, nor such as he ought to know, it is the duty of the owner [general contractor] to warn the [sub]contractor and if he does not do this, of course, he is liable for resultant injury." Veal v. Phillips, 285 Ala. 655, 657-58, 235 So.2d 799, 802 (1970).
"`The duty to keep an area safe for invitees is limited to hidden defects which are not known to the invitee and would not be discovered by him in the exercise of ordinary care. All ordinary risks present are assumed by the invitee, and the general contractor or owner is under no duty to alter the premises so as to [alleviate] known and obvious dangers. The general contractor is not liable to an invitee for an injury resulting from a danger that was obvious or that should have been observed in the exercise of reasonable care. Beck v. Olin Co., 437 So.2d 1236 (Ala.1983); Quillen v. Quillen, 388 So.2d 985 (Ala.1980). The entire basis of an invitor's liability rests upon his superior knowledge of the danger that causes the invitee's injuries. Secrist, supra; Gray v. Mobile Greyhound Park Ltd., 370 So.2d 1384 (Ala. 1979). If that superior knowledge is lacking, as when the danger is obvious, the invitor cannot be held liable. Secrist, supra.'"
562 So.2d at 160, quoting Heath v. Sims Bros. Constr. Co., 529 So.2d 994, 995 (Ala. 1988).
In Armstrong v. Georgia Marble Co., 575 So.2d 1051, 1053 (Ala.1991), this Court stated:
"In Crawford Johnson & Co. v. Duffner, 279 Ala. 678, 189 So.2d 474 (1966), this Court held that any duty on the part of the defendant to warn of dangers in the workplace would ordinarily be discharged by giving notice of the dangers to all supervisory personnel of the plaintiff. In that case, the plaintiffs employer had contracted with the defendant to repair a boiler. The plaintiffs employer knew of the defective switch on the boiler but failed to warn the plaintiff. This Court held that the defendant could not be held liable to the plaintiff because it had discharged its duty by warning the plaintiffs employer of the danger.
"Once a third party discharges its duty by warning the employer, the duty of warning each of the employer's individual employees falls to the employer. `[T]he owner or occupier of particular property has a duty to warn the employees of an independent contractor who has undertaken to do work on the property, *575 of dangers that are hidden on or inhere in that property, and ... this duty is discharged if those in charge of the work for the independent contractor are given warning or have knowledge of the danger.' Gulf Oil Corp. v. Bivins, 276 F.2d 753, 758 (5th Cir.1960), cert. denied, 364 U.S. 835, 81 S.Ct. 70, 5 L.Ed.2d 61 (1960); see, also, Cook v. Branick Manufacturing, Inc., 736 F.2d 1442 (11th Cir.1984)."
After carefully examining the record and the briefs, we conclude that Lloyd Wood had no duty to warn either Gibbs or Bush about the danger posed by the power line. The undisputed evidence indicates that the power line constituted an open and obvious danger and that the Harpole crew, including the crew's on-site supervisor, Joseph Howard, was aware of, and appreciated, that danger. Howard testified:
"Q. Now, had you noticed those power lines?
"A. Yes, I had.
"Q. Before?
"A. Yes.
"Q. Had you said anything to anybody about them?
"A. There were justno.
"Q. Had you warned your crew about them, to stay away from them?
"A. Yes, I did.
"Q. So, you had told Mr. Payne [Carson Payne, a member of the Harpole crew] and Mr. Gibbs and the other man on the job that `There are power lines up there and we've got to be careful'?
"A. Right.
"Q. Had you worked around power lines before?
"A. Yes.
"Q. And you know they're dangerous?
"A. Yes, I do.
"Q. And do you think Mr. Gibbs understood they were dangerous too?
"A. Yes, he did.
"Q. Had you and he talked about the power lines on this specific job?
"A. Not specifically; no more than `Don't build the scaffold up around that wall, you know, the two sections, in case it falls over, we want to miss it.'
"Q. When the crane was moved to the location that it was in when the accident happened, had you said anything about the vicinity of the power lines?
"A. No.
"Q. Why?
"A. The truck was sitting plenty far from the power lines.
"Q. Okay. As long as the boom stayed up?
"A. Right.
"Q. But if the boom came down, it got closer
"A. It extended further out, yes. By being straight up, it made it away from it. And as the pole sank, it took up to it.
"Q. It got closer and closer as it started to leak down?
"A. Right.
"Q. And what do you try to stay? What kind of clearance do you tell your men to stay from power lines?
"A. I recommend 15 feet.
"Q. Okay. You want them to stay 15 feet from any power line?
"A. (Witness nods head affirmatively.)
"Q. And when he first parked there, he was okay?
"A. Right.
"Q. And did you notice that? Did you notice the power line and where he was?
"A. I did.
"Q. And you thought
"A. I was guiding the scaffold there, yes, sir.
"Q. So, you were guiding the scaffold into place?

*576 "A. Right.
"Q. And you thought, `We're okay. We're more than 15 feet away'?
"A. Correct.
"Q. You would have been okay if it hadn't leaked down?
"A. Yes.
"Q. But you didn't need for anybody to tell you that there were power lines there and warn you to look out for them? You knew that yourself?
"A. I knew this and I was told this too.
"Q. But I mean, on this particular day, you were actually conscious of them being there?
"A. Yes.
"Q. And conscious that Gibbs was far enough away from them to work safely?
"A. That's the reason I had it up to the scaffold, yes.
"Q. You had it up to the scaffold so it would be
"A. So it was propping it up, yes.
"Q. And Mr. Gibbs was familiar with where the lines were too, wasn't he?
"A. Right.
". . . .
"Q. Did you ever have any discussion with Mr. Harpole about that power line?
"A. I had mentioned it to him. We had talked about it was sitting farther away from the building safely, a safe distance away from the building. And if I didn't build the scaffold too high, everything would be fine.
". . . .
"Q. So, you had mentioned it to Mr. Bunk Harpole?
"A. Right.
"Q. And you and he decided that it would be fine?
"A. It would be safe, be fine, yes.
"Q. So, you looked at the power line and you thought you could safely work around it; is that correct?
"A. We had until that moment.
"Q. You've been on a job where they, in fact, have shut it down because of a power line being too close?
"A. Yes.
"Q. And when that happened, did you bring the power line to the people's attention and say, `We can't work safely around this one'?
"A. The salesman that usually sells the building [has] all of this done before we get there.
"Q. But there had been jobs where you have said basically, `We're not going to work because the power line is too close'?
"A. That's correct.
"Q. And you didn't work until they shut it down?
"A. Yes.
"Q. And you had the authority to do that. If you thought it was too close you could shut the job down?
"A. Right.
"Q. Okay. And I am sure you knew that was a high-voltage line and, if you hit it, you would be in trouble?
"A. Yes.
"Q. And your men appreciated that too?
"A. Correct.
"Q. And they all understood that, if they hit it, it was bad?
"A. (Witness nods head affirmatively.)
"Q. It was something you could see that was fairly open and obvious?
"A. Yes.
". . . .
"Q. Before the accident, did you know whether it was insulated or uninsulated?
"A. You could tell by standing there looking at it that it wasn't insulated.
"Q. What was it about the line that let you know that?
"A. It was just plain chrome wire."
*577 Another member of the Harpole crew, Carson Payne, also testified with respect to the crew's knowledge of the danger posed by the power line:
"Q. You said that you had seen the power line there at the job site?
"A. Yes.
"Q. There was nothing obstructing your view of it, was there?
"A. No, nothing obstructing the view. I mean, when we got on that corner?
"Q. Yes.
"A. Yes, we saw the power line.
"Q. But just in general too, it's an open and obvious power line, isn't it?
"A. Yes.
"Q. And you can see it running down along the edge of the building?
"A. Yes.
"Q. When y'all were moving that scaffolding in place that morning, didn't you say something to [Gibbs] about being careful about the power line as y'all were moving the boom over?
"A. You're talking about on this corner?
"Q. Yes.
"A. Well, yes, you always say something about power lines. But we wasn't close enough to that power line.
"Q. You were watching it and you were telling him to keep an eye on it?
"A. Yes.
"Q. And you all had talked about the power lines at the job site either at safety meetings or just when you were sitting around talking about the job?
"A. Well, when we was talking about the job, we wasn't really around that power line.
"Now, we had been doing the job all the way around the whole building.
"Q. Had y'all ever talked about that power line at any meetings?
"A. Well, we had safety meetings on Monday. I don't know what that safety meeting was that Monday. We have a safety meeting about different things on
"Q. Every Monday morning?
"A. Yes. I don't know what it was, but I know we have a meeting every Monday. But we have talked about the power lines.
"Q. Okay.
"A. Yes.
"Q. And [Gibbs] and [Bush] knew about the power lines there too?
"A. Yes, they knew about them."
Although there is evidence indicating that Howard and his crew believed they were using the crane a safe distance from the power line, there is no evidence from which a jury could find that Howard was unaware of, or did not appreciate, the danger posed by the power line. Therefore, based on established caselaw, we hold that the trial court properly entered the partial summary judgment for Lloyd Wood. See Ex parte Brislin, 719 So.2d 185 (Ala.1998) (a summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law).
As to the second issue, we note that a Batson challenge to the composition of the jury is untimely if it is made after the venire has been dismissed. See K.S. v. Carr, 618 So.2d 707 (Ala.1993); McGruder v. State, 560 So.2d 1137 (Ala.Crim.App. 1989); White v. State, 549 So.2d 524 (Ala. Crim.App.1989); Brooks v. Winn-Dixie of Montgomery, Inc., 716 So.2d 1203 (Ala. Civ.App.1997), citing United States v. Erwin, 793 F.2d 656 (5th Cir.1986). The record contains the following colloquy between the trial court and the plaintiffs' attorney:
"The Court: Ladies and gentlemen, we have completed the jury-selection process. We have the names of 13 of you because we will have an alternate on this jury as a safeguard against any possible illness or other problem that might arise for some member of the jury *578 forcing his or her excuse. So, as the clerk, Ms. Rice, calls the names of the 13 of you who have been selected to serve on the jury, would you please come forward and have a seat in the jury box.
"[The clerk called the names of the jurors.]
"The Court: All right, ladies and gentlemen, the remainder of you, I have been requested to, in turn, request that you go to Judge Wilson's courtroom on the second floor to participate in the same process they will be conducting with respect to a trial in that courtroom. Judge Wilson's courtroom is the one directly beneath this one. Their courtroom is on the second floor. Either take the stairs, the second door to your right as you go out of the courtroom doors, and go down the stairwells and, of course, you can take the elevator. I assume Judge Wilson wants them in the jury assembly room. The same sort of layout is on the second floor. There is a jury assembly room right outside of his courtroom. We appreciate your patience and cooperation in the jury-selection process.
"[The plaintiffs' attorney]: Judge, may we approach? (The following was held at the bench sotto voce:)
"[The plaintiffs' attorney]: We have [an objection based on] Batson.

"The Court: I'm going to take the position it is untimely. I see three or four of them [jurors] left. I met with you in chambers. You had a preliminary opportunity to bring this up. No one mentioned a Batson [objection]. I have released the jury.
"[The plaintiffs' attorney]: I'm sorry.
"The Court: I deny it. No one said anything, and by the time you said you were coming up here, five or six of them were still remaining. They have been released and gone.
"[The plaintiffs' attorney]: May I put the challenge on the record?
"The Court: I will let you do that when we have a break to relate to this point in time.
". . . .
"The Court: We're going to allow [the plaintiffs' attorney] to place on the record her motion.
"[The plaintiffs' attorney]: I would like to start off on the status thing. Maybe it was my error. I didn't realize we were at the point where we make a decision of whether we were satisfied with the jury or not until they got up and walked out.
"The Court: Well, of course, our jury is sworn at the beginning. We don't individually swear seated jurors in this circuit. They are all sworn at the threshold. So, when they were sworn at the organizational session and then the jury was seated, I gave instructions as to where they were to go next. They basically had all filed out except for a trailing few, and they only have to walk down one floor. I knew at that point [most] of them would already be in Judge Wilson's court or the next courtroom they would go to. I will say for the record, I did not mean to indicate when we had our chambers meeting that I was calling upon you to make a Batson motion as such then because that was a chambers meeting. I invited you all in because the defendant had filed a motion in limine and I needed to address that before you went into opening statements. Nonetheless, having you back there and the jury having already been selected and we were just about to come out here, I guess I would have thought if there was going to be a Batson motion, I might have been alerted to it. And that is all the more reason, as I say, why when the jury was seated and we then instructed them and released the jury and they filed out and then you approached the bench and said you had a Batson motionit is my understanding that once the venire has been released that is the cutoff for a Batson motion.

*579 "[The plaintiffs' attorney]: I guess my other thoughtI have run across this once before. I can't remember what the law says about making a Batson [objection] in front of the whole panel....
"The Court: I think what they have saidyou used to have to make your Batson motion before the jury was sworn, and then they have had cases where when they are all sworn up front, you need to make your Batson motion before the venire is released. That is the cutoff. Again, had I been alerted to the fact there was a possible Batson motion, I would certainly not expect you to do it in the presence of the venire."
The trial court did not err in denying, as untimely, the plaintiffs' Batson objection to the composition of the jury.[2]
With respect to the third issue, the trial court, immediately after instructing the jury on the law of contributory negligence, instructed the jury as follows:
"I further charge you that the law of the State of Alabama as set forth in the Code of Alabama in [§ 37-8-52(a) ] provides as follows:
"`No person shall either personally or through an employee or agent, or as an employee or agent of another, use, operate, place, erect or move any tools, machine [sic, machinery], equipment, apparatus or material, or move any building or other structure or any part thereof within six feet of a high voltage overhead conductor of electricity except where such person has arranged effectively to safeguard against danger of accidental contact with such high voltage overhead conductor of electricity by either: [(1)] The erection of mechanical barriers to [sic, which shall] prevent physical contact from [sic, with] such high voltage overhead conductor; [(2)] or deenergize [sic, deenergizing] such high voltage... conductor and grounding the same; or [(3)] Temporary or permanent relocation of such high voltage overhead conductor.'
"That completes the portion of my charge that relates to the liability issue, that is, the legal principles that you would apply in determining whether or not there had been established a right of the plaintiffs to recover or for either of the plaintiffs to recover in either of the two cases, that is, whether or not the defendant was liable for any damages."
A party is entitled to have the jury correctly instructed on the law, provided the requested instruction is relevant to the case and is not confusing or misleading. Volkswagen of America, Inc. v. Marinelli, 628 So.2d 378 (Ala.1993); American National Fire Ins. Co. v. Hughes, 624 So.2d 1362 (Ala.1993). Because the trial court read § 37-8-52 to the jury, there is no question that the jury was correctly instructed on the law. Instead, the plaintiffs objected to the instruction on the ground that it was confusing to the jury because, the plaintiffs said, there was no "evidence material and relevant to that law." However, after examining the instruction as a whole, we find no error. Lloyd Wood alleged that in regard to the accident that caused his death Gibbs had been contributorily negligent, and the jury was instructed on the affirmative defense of contributory negligence. The plaintiffs do not argue that the trial court erred in instructing the jury on contributory negligence. In Murray v. Alabama Power Co., 413 So.2d 1109, 1114 (Ala.1982), this Court stated:

*580 "We hold that a safety statute or ordinance... can be considered by a jury as going to the standard of care for the self-protection of the plaintiff. A violation of such statute or ordinance can, therefore, be evidence of negligence under certain circumstances. The decision of whether a violation occurred, whether such violation was negligence, and whether such negligence was the proximate cause of the injuries complained of will ... be left entirely to the jury."
Although the trial court could have elaborated on the applicability of § 37-8-52, we think the jury could have reasonably understood that it was to consider that aspect of the law declared by that statute to be one of a number of factors it should consider in determining whether Gibbs had been negligent and, if so, whether his negligence had contributed to cause his death. See, also, Sparks v. Alabama Power Co., 679 So.2d 678 (Ala.1996).

The Claims Against APCo
The plaintiffs' claims against APCo were based on allegations that APCo should have foreseen that Gibbs and Bush would be working dangerously close to the power line and, therefore, should have taken steps to insulate or de-energize the line or to otherwise make the line safer through the use of a fuse or a breaker. APCo argues on appeal, as it did in the trial court, that it had had no knowledge that Gibbs or Bush would be working so close to the power line with a crane; therefore, APCo contends, it could not have reasonably anticipated that they could come in contact with the line and thus it had no duty to insulate or otherwise make the line safer.
The duty of an electric utility to protect persons from dangerous power lines is well settled:
"While this Court has long held that companies engaged in the distribution of electricity are not subject to strict liability, it has held:
"`"The duty of an electric company, in conveying a current of high potential, to exercise commensurate care under the circumstances, requires it to insulate its wires, and to use reasonable care to keep the same insulated, wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith. This statement of the rule implies that, in the absence of statute or municipal ordinance, it is not necessary to insulate wires which are so placed that no one could reasonably be expected to come in proximity to them."`
"Curtis on Law of Electricity, § 510 (as quoted in Alabama Power Co. v. Mosley, 294 Ala. 394, 400, 318 So.2d 260, 264 (1975)); see Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala.1979). In Bush v. Alabama Power Co., 457 So.2d 350 (Ala.1984), this Court further held that the duty to insulate power lines or to protect them with fuses arises only where it is foreseeable that members of the public may come into contact with a wire."
Cherokee Electric Cooperative v. Cochran, 706 So.2d 1188, 1192 (Ala.1997).
The trial court entered a summary judgment for APCo, stating:
"With respect to Plaintiffs' contention that Alabama Power Company had actual or constructive notice of the danger presented by the subject `tap line' to the Harpole work crew, because its employee Terry Fair had been present at the work site on two separate dates, counsel were all in agreement that the work of the Harpole crew had not yet started as of the date of the later of those two occasions, and none of their material or equipment was on the site. Accordingly, none of the work activity the Harpole crew later undertook had yet been commenced; none of its personnel were present; and neither the crane [nor] the scaffolding involved in the incident underlying this litigation, *581 and no equipment, tools, appliances, or material otherwise utilized by, or belonging to, Harpole were present.
"After considering all of the materials and submissions of record (including the February 3, 1998, deposition of Plaintiffs' expert, M.A. Martin, Jr., under the circumstances hereinafter explained) and considering the applicable law, the Court finds that there is no genuine issue as to any material fact relevant to the liability issues involving Alabama Power Company and that it is entitled to judgment as a matter of law. Accordingly, the Court hereby enters judgment in favor of Alabama Power Company with respect to all of the claims and theories of liability asserted against it by the respective Plaintiffs...."
The plaintiffs cite nothing in the record that would contradict the trial court's finding that Terry Fair, the APCo engineer on whose presence at the construction site the plaintiffs rely to establish the requisite knowledge on APCo's part, was not on the construction site while the Harpole crew was using the crane in close proximity to the power line. The plaintiffs argue, however, that during his deposition Fair admitted to being on Watermelon Road at various unspecified times while the Harpole crew was on the construction site; Fair testified that he was supervising the relocation of power poles and lines on that road. According to the plaintiffs, a jury could reasonably infer that if Fair was involved in a project on that road, then he must have seen the Harpole crew using the crane within close proximity to the power line. We cannot agree.
Viewing Fair's testimony in the light most favorable to the plaintiffs, as our standard of review requires us to do, see Ex parte Brislin, supra, we conclude that a jury could reasonably infer that Fair was, at certain times, working in close proximity to the construction site while the Harpole crew was present. However, Fair never testified that he saw the Harpole crew using the crane, or that he ever saw a crane on the construction site. In the absence of such testimony, or some other evidence indicating that Fair was actually at a point where he could have seen the construction site while the Harpole crew was working there in close proximity to the power line, we must conclude that the evidence was not sufficient to submit to the jury the plaintiffs' claims against APCo. See Bonner v. Electric Power Board of the City of Scottsboro, 583 So.2d 260 (Ala.1991); see, also, Campbell v. Alabama Power Co., 378 So.2d 718 (Ala.1979). A jury is not allowed to speculate; it must be able to make reasonable inferences based on the evidence. Western Supermarkets, Inc. v. Cox, 584 So.2d 820 (Ala. 1991); White v. Cooper Green Hospital, 523 So.2d 371 (Ala.1988); Wagner v. Winn-Dixie, 399 So.2d 295 (Ala.1981).
For the foregoing reasons, the judgments are affirmed.
1971648AFFIRMED.
1971649AFFIRMED.
HOOPER, C.J., and MADDOX, SEE, and BROWN, JJ., concur.
KENNEDY, COOK, LYONS, and JOHNSTONE, JJ., concur in part and dissent in part.
JOHNSTONE, Justice (concurring in part and dissenting in part).
I dissent from the holding that the plaintiffs waived their Batson objections to defendant Lloyd Wood's exercise of its peremptory strikes. This issue is constitutional. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
No party should be required to interpose Batson objections before the petit jury is seated in the jury box, because the objections may not become completely apparent until the party has visually observed the selected and seated petit jury. The record in this case shows that the plaintiffs did interpose their Batson objections immediately after the petit jury had *582 been seated, although the trial judge had already begun to release the remainder of the venire without asking the parties whether they were satisfied with the seating of the jury or otherwise allowing the parties any opportunity whatsoever to interpose Batson objections.
Because, unbeknownst to plaintiffs' counsel, all venirepersons for the entire circuit had already been sworn elsewhere at the empaneling of the venire at the beginning of the week, the trial judge did not swear this petit jury after he seated the jurors. Thus the plaintiffs did not have the opportunity of even an announcement by the trial judge that he was going to swear the jury to trigger the plaintiffs' Batson objections before the trial judge told the remaining venirepersons to go to another judge's courtroom. The record is clear that the trial judge could have stopped the exodus of the venire and could have retrieved the veniremembers who were already on their way one floor downstairs without any substantial delay; and the trial judge owed a duty to do so. See White v. State, 549 So.2d 524 (Ala.Crim. App.1989).
The plaintiffs preserved in the record a prima facie showing that defendant Lloyd Wood's peremptory strikes were racially motivated in that this defendant struck all four blacks from the venire without having sought or received any voir dire answers that would suggest prejudice or bias in three of them. Ex parte Bird, 594 So.2d 676 (Ala.1991); Jackson v. State, 557 So.2d 855 (Ala.Crim.App.1990). Likewise, the trial judge wisely instructed Lloyd Wood to preserve for itself its reasons for striking these venirepersons for reference in the event of a remand requiring a further Batson hearing before the trial judge.
Thus, I would reverse the judgment in favor of Lloyd Wood and remand, with instructions to determine whether Lloyd Wood had valid race-neutral reasons for its strikes of the four black venirepersons and, if not, to order a new trial on the claims which survived summary judgment against Lloyd Wood only. In all other respects, I concur with the majority.
KENNEDY, COOK, and LYONS, JJ., concur.
NOTES
[1] The plaintiffs sought damages from several other defendants; those defendants either settled, were dismissed on motion of the plaintiffs, or received a summary judgment. Lloyd Wood and APCo are the only defendants involved in these appeals.
[2] The plaintiffs argue that they were not at fault in making their Batson challenge after the venire had been released, because, they say, they did not know that the members of the venire had been sworn beforehand. However, whether the members of the venire had been sworn does not determine the timeliness of a Batson challenge. See Brooks v. Winn-Dixie of Montgomery, Inc., 716 So.2d 1203, 1206 (Ala.Civ.App.1997) (affirming the trial court's denial of a Batson challenge as untimely where the challenge was made after the unselected members of the venire had been dismissed but before the selected jurors had been sworn).