20 So.3d 770 (2009)
MOBILE GAS SERVICE CORPORATION
v.
Rosa ROBINSON, individually and as administratrix and personal representative of the estate of Harriett Robinson, deceased, and as mother and next friend of David McMeans, Kelvin McMeans, and Harriett Johnson.
1061727.
Supreme Court of Alabama.
January 30, 2009.
Rehearing Denied April 17, 2009.
*772 Scott G. Brown and Andrew W. Martin, Jr., of Armbrecht Jackson, LLP, Mobile, for appellant.
George W. Finkbohner III, Robert T. Cunningham, Jr., and David G. Wirtes, Jr., of Cunningham Bounds, LLC, Mobile, for appellee.
WOODALL, Justice.
Mobile Gas Service Corporation ("the Company") appeals from a judgment entered on a jury verdict in favor of Rosa Robinson, individually and as administratrix and personal representative of the estate of Harriett Robinson, deceased, and as mother and next friend of David McMeans, Kelvin McMeans, and Harriett Johnson, minors, in Robinson's wrongful-death/personal-injury action against the Company alleging carbon-monoxide poisoning at a house Robinson was renting at 306 4th Avenue, Chickasaw. We reverse and remand.

I. Factual and Procedural Background

A. The Company's Policies
Facts relevant to this appeal occurred as early as 1985. In two separate incidents that year, a total of nine people died and others were injured when they were overcome by carbon monoxide in dwellings located in Mobile County and having natural-gas service supplied by the Company. In both incidents, the primary culprit was a customer-owned central-heating unit situated in a closet or hallway. In the first incident, carbon monoxide circulated *773 throughout the residence because the blower door of the furnace had been removed, thereby allowing the blower to direct the products of furnace combustion throughout the building.
The 1985 incidents resulted in a change in the Company's practices and policies toward customer-owned appliances that pose potential carbon-monoxide hazards. Until the 1985 incidents, the Company's practice was merely to place a red warning tag on any customer-owned appliance found to be hazardous. Although the service technician would take a copy of the warning tag to the Company's office, the Company, nevertheless, initiated gas service at the residence without any follow-up measures to ensure that repairs were ever made.
As a result of the deaths and injuries in 1985, George Yon, then "vice president of operations" for the Company, conducted an evaluation of the effectiveness of the Company's warning practices. He discovered that  in thousands of cases  the customers had simply removed the red warning tags and continued to use the hazardous appliances in their unrepaired condition. Consequently, he amended the Company's policies and procedures in various written segments (hereinafter referred to collectively as "the manual"). As amended, the manual included a "hazardous conditions checklist," which stated, in pertinent part:
"Listed below are hazardous conditions which, when encountered in the field, must result in the serviceman tagging an appliance out-of-service or refusing to turn gas on to the premises. Some situations will also require that the appliance be disconnected, such as:
" Appliance producing unsafe levels of CO [carbon monoxide]
" Faulty safety control
" . . . .
" Situations as described in . . . Hazardous Appliance Report."
(Second emphasis added.)
Regarding the "Hazardous Appliance Report," sometimes referred to as a "red tag,"[1] the manual stated:
"This three-part form and envelope will be used by [the Company] to notify a customer that an appliance has been turned off due to a defective and unsafe condition. This form will be completed in triplicate including the obtaining of the customer's signature. The signature will provide evidence that the contents of the form have been explained to the customer and the customer has been given a copy.
"The top copy will be folded and placed in the unsealed envelope and attached to the defective appliance by the string provided.
"The middle copy will be turned in with the serviceman's service request order for that address.
"The third copy will be left with the customer or his representative.
"The customer shall be instructed either they or their contractor complete the form and mail to the [C]ompany in the self-addressed, postage-paid envelope attached to the appliance.
"If more than one appliance is defective at the same address, a separate report must be completed for each.
"Each day the Customer Service Assistant will be responsible for entering the `Red Tag' information into the computer utilizing the Company copies attached *774 to the servicemen's service request orders.
"The `Hazardous Appliance Reports' will be kept on file in the Customer Service Dispatching Office. This document will be available at all times to field employees. . . . These forms will be maintained for no less than five (5) years.
"On customer or contractor copies received by mail which indicate the work has been completed, the word `Mail' will be entered into the tag file where the serviceman's work number normally appears. This action will not clear the appliance red tag from the computer files [emphasis in original]. Only our visual inspection will permit clearing from the red tag system files.

"Subsequently, if we return to the same service address for any reason, a `Red Tag' order form will be issued. It is the responsibility of the Serviceman to re-examine that appliance. If it has been repaired or replaced, he will issue a filed service request showing that he `removed' the tag. Upon receiving that day's service request forms, the Customer Service Assistant will update the `Red Tag File' showing the `Tag Removed.'
"However, if the appliance has not been repaired or replaced, the serviceman will proceed as follows:
"1. If his order requires the meter to be turned on (including regular Turn-On, New Sets, Old Sets, etc.), he will turn on the meter and disconnect the faulty appliance, if possible.
"2. If his order requires other services (including Routine Changes, Change for Test, etc.) and the meter is on, he will (if possible) disconnect the faulty appliance and notify the customer that repairs must be made, and that a report will be made to the Building Inspection Services.
"3. No later than the next regular scheduled work day, a Service Department clerk will mail to the proper building inspection authority a copy of the `Hazardous Appliance Report' for that address. The clerk will then initial and date the original Company copy to indicate that the report has been mailed to the proper authorities.
"4. All local and county building inspection authorities in our service area have indicated they will inspect the defective appliance(s) and instruct the owner/occupants to have the necessary repairs made within ten (10) days. If corrections have not been made within ten (10) days, they will instruct [the Company] to turn off the meter or disconnect the service."
(Emphasis added except as otherwise noted.)
Each red tag contained 48 categories of hazardous conditions for which an appliance was to be "turned off," with appropriate boxes to be checked by the service personnel, including the following:
"B2 ___ Badly corroded burners.
". . . .
"S1 ___ Inoperative or disconnected controls affecting safe operation of an appliance.
". . . .
"V4 ___ Products of combustion spill[ing] at [the] diverter."
A key aspect of the Company's new policies contemplated the coordination of its service personnel with municipal building inspectors. According to Yon, he forged an agreement with the heads of building-inspection departments in all the municipalities in which the Company provided *775 service, pursuant to which the inspectors would enforce customer compliance with the Company's new red-tag policies. Under this alleged arrangement, whenever a customer failed to satisfy the Company that a red-tagged appliance had been repaired or replaced, the Company would send a hazardous-appliance report to the appropriate building inspector, who, in turn, would inspect the premises and, if necessary, order the Company to discontinue natural-gas service to that customer until the repairs were made.
However, the actual implementation of Yon's new policies encountered some logistical difficulties. Municipal officials complained that they did not have sufficient inspection personnel to investigate all the hazardous-appliance reports that were being sent them. Consequently, building inspectors requested that no more such reports be sent.
Also, Yon's policy of refusing natural-gas service to customers who ignored red-tag warnings created tension with the Company's marketing division, which complained that strict enforcement by the service division was causing a reduction in the volume of the Company's natural-gas sales. Yon retired in 1987. Yon testified at trial that, at the time he retired, his policies were still in effect and were being enforced. Yon's successors, however, admittedly did not implement or enforce his written policies. In 2002, in particular, Alan Hobbs removed language from the manual requiring the Company to disconnect hazardous appliances.

B. The Robinson Residence
Meanwhile, on August 25, 1999, the Company received a request for natural-gas service at a residence at 306 4th Avenue in Chickasaw. The Company's service personnel inspected the appliances in the house and discovered a central-heating unit (hereinafter referred to as "the CHU") similar to the one involved in one of the 1985 incidents, similarly situated in a central hallway closet, and similarly defective. The service technician filled out a hazardous-appliance report, checking the boxes to indicate that the CHU had (1) "[b]adly corroded burners," (2) "[i]noperative or disconnected controls affecting safe operation of [the] appliance," and (3) "[p]roducts of combustion spill[ing] at [the] diverter." Although the occupant was provided with a copy of the hazardous-appliance report, gas service was, nevertheless, initiated at the residence.
In January 2004, Tyrone Wilson purchased the house. Wilson owned a number of properties, which he, in turn, leased to residents.
On May 1, 2004, Rosa Robinson rented the house from Wilson. On June 3, 2004, one of the Company's service technicians visited the residence at Robinson's request to establish natural-gas service. An inspection of the premises revealed that the same hazardous conditions noted in the CHU in the hazardous-appliance report completed in 1999 were still present, namely, (1) "[b]adly corroded burners," (2) "[i]noperative or disconnected controls affecting safe operation of [the] appliance," and (3) "[p]roducts of combustion spill[ing] at [the] diverter." Indeed, the technician discovered that the "disconnected controls" included an important safety feature that had been "jumped out," that is, the feature had been deliberately bypassed by splicing wires. This unauthorized bypass allowed the CHU to operate without the blower door in place, which, in turn, allowed the "products of combustion"  including carbon monoxide  to diffuse throughout the residence. Thus, despite the issuance of a red-tag warning in 1999, the CHU had not been repaired.
*776 The technician completed another hazardous-appliance report. In a space provided for "recommendations," the technician wrote: "blower door switch." Having thus retagged the CHU for the unrepaired defects, the technician extinguished the pilot light to the CHU and turned off the valve in the natural-gas line leading to it. However, he installed a gas meter and turned on the natural-gas service to the residence. Robinson promptly delivered her copy of the hazardous-appliance report to Wilson's secretary.
Approximately a week later, the Company sent a service technician back to the residence to repair a gas leak in the backyard. At that time, the technician observed that the CHU had not been repaired.
By December 2004, the CHU still had not been repaired. Robinson made a number of unavailing requests of Wilson to repair it. In the meantime, she attempted to heat the house with electric space heaters and the kitchen range. Also residing in the home at that time were Robinson's three minor children, David McMeans, Kelvin McMeans, and Harriett Johnson, as well as Harriett Robinson, her elderly mother.
On December 22, 2004, after Robinson's brother had visited the family and had discovered the harsh living conditions, he telephoned Wilson to complain about the lack of an effective heater in the house. The next day, Wilson came to the house and lit the CHU. Before he left, however, Robinson remarked to him that the CHU "smell[ed] funny." Wilson promised to send someone to look at it.
A few minutes later, Robert Harris, an employee of Harry Balbuena d/b/a Harry's A/C and Heating ("Harry's Heating"), arrived, opened the closet where the CHU was located, and began working. Robinson left for work while Harris was still at the house. According to Harriett Johnson, the minor daughter, the house subsequently began to warm and Harris left.
That night, Robinson came home early from her job at a Wal-Mart discount store and began baking pastries for Christmas. She was the last of her family to retire for the night at approximately 1:00 a.m. Shortly thereafter, Harriett Johnson awoke, gasping for air, and fell out of bed. She was dizzy and had a severe headache. She crawled on her hands and knees to her mother's bedroom and awakened Robinson. Robinson was dizzy and her head was hurting. Robinson then awakened David, who also complained of a severe headache. Subsequently, they awakened Kelvin, who was also complaining of a headache, and telephoned the fire department. By the time rescue personnel arrived, the family members were nauseous and vomiting.
All family members were taken by ambulance to Springhill Memorial Hospital ("the hospital"), where they were diagnosed with, and treated for, carbon-monoxide poisoning. Robinson and her three children were released from the hospital later that day, but her mother suffered seizures from the exposure to the carbon monoxide and died on December 31, 2004.
Later on the day of incident, service technicians from the Company were summoned to Robinson's residence by the fire department. They discovered the CHU in the same unrepaired hazardous condition as had been noted in June. As an example, the blower door had been removed, but, because the safety feature had been bypassed, the CHU would still operate.
The technicians tested the air inside the house after operating the CHU for 15 minutes. The tests revealed high concentrations of carbon monoxide throughout the residence. They retagged the CHU. *777 This time, however, they also disconnected the CHU from the natural-gas line and "capped off" the gas line. Effective repairs were finally made to the CHU on or about December 28, 2004. On December 29, 2004, technicians from the Company revisited the residence, determined that the CHU was operating properly, and removed the red tag.
Robinson sued the Company, as well as Tyrone Wilson d/b/a T & T General Contractors and T & T Home Rental and Construction LLC, Harris, and Harry's Heating, seeking compensatory and punitive damages under theories of negligence and wantonness for the personal injuries to Robinson and her three minor children and seeking punitive damages for the alleged wrongful death of Robinson's mother. Robinson's theory of liability against the Company at the trial of the case was that the Company should never have initiated natural-gas service at Robinson's residence given its knowledge of the circumstances surrounding the CHU.
Over the Company's objections at trial, evidence was admitted indicating that the City of Mobile and the City of Chickasaw had adopted in 1991 and 1993, respectively, the following ordinances:
"[Mobile] Sec. 45-61. Reconnection of discontinued gas service.
"Whenever in a building or structure where the gas service has been discontinued and a hazardous report from the [Company] has been sent to the inspection services department of the city, it shall be necessary that an investigation fee be paid, that the indicated hazardous conditions be corrected, and that a visual inspection be conducted by the mechanical inspection services of the city, and that an approval by this agency be obtained before reconnection to the gas supply may be effected."
"[Chickasaw] Sec. 18-158. Investigation of hazardous conditions.
. . . . . . .
"Whenever in a building or structure where the gas service has been discontinued and a hazardous report from the [Company] has been sent to the codes inspector, it shall be necessary that an investigation fee of $10.00 be paid, that the indicated hazardous conditions be corrected, that an inspection be conducted by the codes inspector and that an approval by such inspector be obtained before reconnection to the gas supply may be effected."
(Emphasis added.)
The Company moved for a judgment as a matter of law ("JML") at the close of all the evidence. Its motion was denied. Over the Company's objections, the court charged the jury: "All persons or entities who conduct activities in Alabama are presumed to know its laws. Everyone is presumed to know the law. Ignorance of the law is no excuse. Citizens are deemed to have constructive knowledge of the law." (Emphasis added.) Hereinafter, this charge will be referred to as "the no-excuse charge."
During its deliberations, the jury submitted the following written question to the court: "Is an ordinance a law?" Without advising the Company's counsel of the question or providing an opportunity for counsel's input, the court answered the jury's question in the affirmative.
Subsequently, the jury returned a verdict in favor of Robinson and against the Company, Wilson, and Harris. It awarded $2,400,000 for the wrongful-death claim. The jury awarded compensatory damages of $600,000 for the personal-injury claim asserted by Robinson and $250,000 for the personal-injury claim asserted on behalf of each minor child. Finally, the jury assessed *778 $200,000 in punitive damages against the Company.[2] The trial court entered a judgment on that verdict. The Company then renewed its motion for a JML and moved, in the alternative, for a new trial or a remittitur of the damages. That motion was overruled, and the Company appealed.

II. Discussion
On appeal, the Company contends that it was entitled to a JML on the grounds (1) that it was not required to assure that the hazardous CHU had been repaired or replaced before initiating natural-gas service to Robinson's residence, and (2) that, even if it was required to assure that the repair had been made, its breach of any standard requiring it to do so was not the proximate cause of the incident. In the alternative, it insists that it is entitled to a new trial because the trial court gave erroneous or misleading jury instructions.

A. Grounds for a JML
Our standard of review of a ruling on a motion for a JML is well settled. We "`use[] the same standard the trial court used initially in granting or denying a JML.... Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution."' Myrick v. Barron, 820 So.2d 81, 83 (Ala. 2001) (quoting Delchamps, Inc. v. Bryant, 738 So.2d 824, 830 (Ala.1999)). We "`determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury,"' and we "`view[] the evidence in the light most favorable to the nonmovant and entertain[] such reasonable inferences as the jury would have been free to draw."' Myrick, 820 So.2d at 83 (quoting Delchamps, 738 So.2d at 830-31).

1. Standard of Care
The issue, as the Company correctly frames it, is "whether [the Company's] actions on the day(s) of its alleged negligence fell below the required degree of skill and prudence observed at that time." The Company's brief, at 83.
It is well established that "`[t]hose dealing with dangerous commodities, such as [natural] gas, must use a degree of care commensurate with the dangers involved; this degree of care is the same degree of care and vigilance which persons of skill and prudence observe under like circumstances."' Sungas, Inc. v. Perry, 450 So.2d 1085, 1088 (Ala.1984), abrogated on other grounds, Garner v. Covington County, 624 So.2d 1346 (Ala.1993) (quoting Chilton Butane Gas, Inc. v. Marcus, 289 Ala. 292, 296, 267 So.2d 140, 143 (1972)). "A gas company is guilty of negligence if a leak in a customer's... appliances causes injury ..., provided the company has sufficient notice of such leak ..., and having such notice (a) negligently inspects or negligently repairs; (b) agrees and assumes to inspect and repair, and then fails to do so; [or] (c) refuses to inspect and repair knowing a dangerous condition exists, and with such knowledge fails to shut off its gas until the owner can have his pipes and appliances properly repaired." Miller v. Wichita Gas Co., 139 Kan. 729, 732, 33 P.2d 130, 132 (1934).
"[W]hen a [gas] company has actual knowledge of a dangerous defect in a customer's equipment or appliance, it has a duty to exercise reasonable care to shut off the service to such equipment or appliance." *779 Hegwood v. Virginia Natural Gas, Inc., 256 Va. 362, 369, 505 S.E.2d 372, 377 (1998) (emphasis added). See also Bellefuil v. Willmar Gas Co., 243 Minn. 123, 128, 66 N.W.2d 779, 783 (1954) ("whenever a gas company is in possession of facts that would suggest to a person of ordinary care and prudence that an appliance of a customer is leaking or is otherwise unsafe for the transportation of gas, the company has a duty to investigate, as a person of ordinary care and prudence similarly situated and handling such a dangerous substance would do, before it continues to furnish additional gas"). When a gas company has knowledge of a hazardous defect in a customer's appliance, "the question whether on the particular facts that gas company acted diligently to avert the ensuing... asphyxiation goes to the jury." Rosado v. Boston Gas Co., 27 Mass.App. Ct. 675, 678, 542 N.E.2d 304, 306 (1989). Thus, the Company's argument for a JML must be rejected if there is substantial evidence indicating that the Company, armed with its knowledge of the circumstances and the condition of the CHU, breached the standard of care in installing a meter at the residence and providing natural-gas service before the known danger posed by the CHU had been eliminated.
In that connection, Robinson presented the expert testimony of George Yon. Yon had written and implemented polices and procedures for the Company in response to the carbon-monoxide deaths and injuries that occurred in 1985. He testified that, in literally thousands of cases of which the Company had record, its customers had continued to use appliances that the Company had, by its red-tag procedure, declared to be "out-of-service." Yon's policies attempted to address that specific problem by designating certain hazards as serious enough to require the Company to "turn off the meter or disconnect the service." Among such hazards were those that were present in this case, namely, an "[a]ppliance producing unsafe levels of CO [carbon monoxide]," because of "[b]adly corroded burners," "[i]noperative or disconnected controls affecting safe operation," and "[p]roducts of combustion spill[ing] at [the] diverter."
During Yon's testimony, the following colloquy occurred:
"Q. [By Robinson's counsel:] Based on your training and experience in the policy and procedures that you wrote, do you have an opinion as to whether gas service should have been initiated on June 3, 2004, by Mobile Gas?
"A. [By Yon:] Absolutely not."
(Emphasis added.)
It is undisputed that, after Yon retired, the Company discontinued these policies, and there was evidence indicating that they were discontinued for financial reasons. Nevertheless, similar standards were reflected in training materials promulgated by the Midwest Gas Association, Inc.[3] In particular, training "module 322" stated, in pertinent part:
"Follow these six steps to check appliances and connections.
"1. Locate all gas appliances and gas outlets.
". . . .
"2. Inspect appliances for unsafe conditions.
" Don't establish service if unsafe conditions are not corrected.

*780 " Disconnect or turn the appliance off at the appliance valve to correct unsafe conditions."
(Emphasis added.) There was evidence indicating that the Company actually used these training materials in the years between Yon's retirement and the carbon-monoxide-poisoning incident at Robinson's residence.
Thus, there was substantial evidence indicating that gas-industry standards include the duty to "turn off the meter or disconnect the service" to a residence containing unrepaired hazardous appliances of which the Company has knowledge. Although "[p]roof of industry practices . . . cannot conclusively establish the defendant's duty," they are "admissible for the jury's consideration in its application of the `reasonable care' standard." Dunn v. Wixom Bros., 493 So.2d 1356, 1360 (Ala.1986). Whether the Company has "effectively shut off the gas" under the circumstances is a question for the jury. Fields v. Missouri Power & Light Co., 374 S.W.2d 17, 24 (Mo.1963) (emphasis added).
The Company had examined the CHU at Robinson's residence on three occasions between August 25, 1999, and the time of the incident that is the subject of the underlying action, and had observed the same hazardous conditions each time, despite the Company's red-tag warnings. Moreover, the Company had a record of other rental properties owned by Tyrone Wilson, which its records showed contained appliances that had been repeatedly tagged for the same hazards. In other words, the Company knew in June 2004 when it initiated service at Robinson's residence that Wilson was notably remiss in addressing the problems indicated on the hazardous-appliance reports relating to his properties. Consequently, the Company had no reason to trust that repairs to the CHU would be made expeditiously. Based on what it knew of the repair history of appliances in buildings owned by Wilson, the Company could not close its eyes to the known danger posed by its supply of natural gas to the residence in the hope that Wilson would remedy the defects in the CHU before the CHU was put back into use. Thus, Robinson presented substantial evidence indicating that the Company failed to use the "degree of care commensurate with the dangers involved;... the ... degree of care and vigilance which persons of skill and prudence observe under like circumstances." Sungas, 450 So.2d at 1088.

2. Proximate Cause
The Company also contends that any wrongful conduct on its part was not the proximate cause of the carbon-monoxide incident at Robinson's residence. This is so, because, it argues, the conduct of Wilson and Harris in putting the unrepaired CHU back in service on December 23, 2004, was, as a matter of law, a superseding, intervening cause. We disagree.
"`"The proximate cause of an injury is that cause which, in the natural and probable sequence of events, and without the intervention or coming in of some new or independent cause, produces the injury, and without which the injury would not have occurred."' Hicks v. Vulcan Eng'g Co., 749 So.2d 417, 424 (Ala.1999)(quoting trial court's jury charge). `[I]f a new, independent act breaks the chain of causation, it supersedes the original act, which thus is no longer the proximate cause of the injury.' Riojas v. Grant County Pub. Util. Dist., 117 Wash.App. 694, 697, 72 P.3d 1093, 1095 (2003). `[A]n [act] is superseding only if it is unforeseeable. A foreseeable intervening [act] does not *781 break the causal relationship between the defendants' actions and the plaintiffs' injuries.' Kelly v. M. Trigg Enters., Inc., 605 So.2d 1185, 1190 (Ala. 1992) (emphasis added).
"`Ordinarily, it is a jury question whether consequences of an act are reasonably foreseeable . . . .' Sly v. South Cent. Bell Tel. Co., 387 So.2d 137, 140 (Ala.1980)."
Alabama Power Co. v. Moore, 899 So.2d 975, 979 (Ala.2004).
It is undisputed that the cause of the carbon-monoxide incident in this case was the operation of the CHU without the blower door in place. Operating the CHU without the blower door in place "created `negative pressure in the heating closet' which pulled the products of combustion into the conditioned air." The Company's brief, at 38. Such operation was made possible by the manual bypass of the safety device, of which the Company had actual knowledge.
Nevertheless, according to the Company, the "injuries would not have occurred `but for' the conduct of Mr. Wilson and Mr. Harris, who negligently put the [CHU] in service with the blower door off." The Company's brief, at 39 (emphasis in original). According to the Company, it could not, as a matter of law, have foreseen "that a heating technician, Mr. Harris, would put a gas heater into service and leave the blower door off." The Company's brief, at 46. We disagree.
As we discussed in the preceding subpart of this opinion, the Company well knew that Wilson was remiss in addressing the problems indicated on its hazardous-appliance reports for rental properties owned by Wilson. This knowledge was based on its record of homes owned by Wilson in which appliances had been tagged, but not repaired. Thus, the Company had no reason to trust that a "heating technician" would attend to the CHU. In fact, the Company admits that it had no knowledge of Harris's activities at the Robinson residence until after the incident. The Company's brief, at 37. In other words, it was not unforeseeable as a matter of law that the CHU would be placed back in service in the same unrepaired and hazardous condition in which it was last observed by the Company's service technician in June 2004. Whether the activities of Wilson and Harris were, therefore, an intervening cause of the accident could not be answered as a matter of law.
In short, there was substantial evidence indicating that if the Company had refused to initiate service at the gas meter in June 2004 because of the hazards it discovered at that time, this accident would not have occurred. Thus, the Company was not entitled to a JML.

B. Grounds for a New Trial
The Company's argument for a new trial based on an erroneous jury charge, however, stands on better ground. It contends that the trial court erred in giving the no-excuse charge. It contends that the charge could have referenced only to the two ordinances, Mobile's ordinance § 45-61 and Chickasaw's ordinance § 18-158, and that neither ordinance has any application to this case. We agree.
"A party is entitled to have the jury correctly instructed on the law, provided the requested instruction is relevant to the case and is not confusing or misleading." McGregory v. Lloyd Wood Constr. Co., 736 So.2d 571, 579 (Ala.1999) (emphasis added). "[I]t is the duty of the trial court to instruct the jurors fully and correctly on the applicable law of the case and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their *782 search for truth." American Cast Iron Pipe Co. v. Williams, 591 So.2d 854, 856 (Ala.1991). See First Commercial Bank v. Spivey, 694 So.2d 1316, 1324 (Ala.1997) ("[T]he trial court has the responsibility to give the jury instructions ... that will allow it to adequately respond to the evidence and the issues presented."). Thus, depending on the issues and evidence presented, jury instructions that are entirely "`proper in many cases, [may be] totally improper in the instant case."' Jefferson v. Fleming, 669 So.2d 870, 873 (Ala.1995).
It requires no speculation to conclude that the no-excuse charge was referable solely to the two municipal ordinances. The case involved no other statutes or ordinances, and the jury's question whether "an ordinance [is] a law" was a clear indication that the jury had made that connection. Nor can it be doubted that the combination of the ordinances and the charge implied to the jury some mandatory duty on the part of the Company. That is the unmistakable import of the words "[i]gnorance of the law is no excuse," meaning that "ignorance of the law is no excuse for not following the law." However, the plain meaning of the ordinances in the context of the facts of this case belie any such duty.
The ordinances differ in no respect relevant to this case. They state, in pertinent part: "Whenever in a building or structure where the gas service has been discontinued and a hazardous report from the [Company] has been sent" to the applicable municipal-inspection authority, approval from such authority is required "before reconnection to the gas supply may be effected." Notably, the ordinances do not require the Company to disconnect service under any circumstances. Neither do they require the Company to send a hazardous report under any circumstances. Thus, they shed no light on the dispositive issue, which is whether the Company acted reasonably in initiating service at the gas meter at the Robinson residence in June 2004 despite the hazards it discovered at that time.
Although there is evidence indicating that service had been disconnected at 306 4th Avenue before Robinson's tenancy, there is no evidence indicating that the cause of the disconnection was the hazards that existed in June 2004. Certainly, there is no evidence indicating that the Company ever sent a "hazardous report" to any Chickasaw official. There is no evidence, therefore, indicating that the provisions of the Chickasaw ordinance were ever triggered. Because the ordinances were inapplicable under the facts of this case, the no-excuse instruction served no purpose other than to distract and confuse the jury.
Indeed, the purpose and import of the charge is nowhere better exemplified than in the following argument by Robinson's counsel regarding the motion for a JML made at the close of Robinson's case-in-chief:
"The Chickasaw ordinance says that `whenever a building or structure where gas service has been discontinued'  okay, so there is no gas service  `and a hazardous report from [the Company] is sent to the codes inspector, it shall be necessary that an investigation fee be paid, investigation of the hazardous conditions be conducted, that the inspection by the codes inspector and an approval by the codes inspector be obtained before reconnection to the gas supply may be effected.'
"... [The Company] cannot reconnect to the supply under the binding law; and [it] just want[s] to ignore the law. [It] want[s] to ignore the law. [It] cannot reconnect without waiting until and *783 having confirmation that the hazardous appliances have been repaired.
"So the fallacy of [the Company's] argument is what [it has] absolute control over, which is this thing right here, and all the pipes leading up into it, and the knowledge that the appliances in the house have deadly hazards associated with them, and there is not a single one in there on June 3 that doesn't, [it] know[s] that. [The Company] cannot legally supply gas. [It] cannot legally do it."
(Emphasis added.)
It is clear that the jury was led to conclude, incorrectly, that, somehow, one, or both, of the ordinances was binding on the Company under the facts of this case, and that, therefore, the Company had illegally provided gas service to Robinson's residence. Because the ordinances were inapplicable under the facts of this case, the giving of the no-excuse charge was reversible error. The judgment is, therefore, reversed, and the case is remanded for a new trial.

III. Conclusion
In summary, the trial court did not err in denying the Company's motions for a JML. However, because of the erroneous jury charge, the judgment is reversed and the case is remanded for further proceedings consistent with this opinion.[4]
REVERSED AND REMANDED.
STUART, BOLIN, and PARKER, JJ., concur.
SMITH, J., concurs in the result.
MURDOCK, J., concurs in part and dissents in part.
COBB, C.J., recuses herself.
MURDOCK, Justice (concurring in part and dissenting in part).
I concur in the main opinion except as to Part II.A, as to which I dissent.
NOTES
[1] Actually, the term "red tag" refers to a red envelope into which a customer's copy of the hazardous-appliance report is placed and that is physically affixed to the appliance.
[2] The only issues in this appeal involve the judgment against the Company.
[3] The Company does not dispute Robinson's allegation that Midwest Gas Association, Inc., is an entity that "serves 250[gas] companies in 15 Midwestern states."
[4] These holdings obviate the need to address other issues argued by the Company.